STATE OF MAINE                                    BUSINESS AND CONSUMER COURT

Cumberland, ss.

**JAY McLAUGHLIN,**

                           Plaintiff

           v.                                              Docket No. BCD-CV-15-14

**EMERA MAINE,** f/k/a Bangor Hydro-Electric Company,
and **HAWKEYE, LLC**

                           Defendants

## DECISION

This case involves an action by Jay McLaughlin ["Plaintiff" or "Mr. McLaughlin"], the owner of a large woodlot in Greenbush, Penobscot County, Maine, against Emera Maine ["Emera"], an electric utility company, and Hawkeye, LLC ["Hawkeye"], Emera's construction contractor, for damages arising out of injury and loss to roads, land, trees and vegetation on Plaintiff's property.

Plaintiff McLaughlin's Amended Complaint asserts six counts against both Defendants, except where indicated: Count I (Breach of Contract, License Agreement) against Emera only; Count II (Negligence); Count III (Injury to Land -- 14 M.R.S.A. §7552); Count IV (Trespass -- 14 M.R.S.A. §7551-B); Count V (Promissory Estoppel -Breach of Contract), and Count VI (Defendants regarding building of the "Spur Road" –Trespass).

Both Defendants answered, denying liability and asserted affirmative defenses. In addition, Emera Maine filed a cross-claim against Hawkeye, asking that Hawkeye indemnify Emera against any damages assessed against Emera and for Emera's attorney's fees and costs incurred in the defense of this action.

1

As a result of Defendants' motions for summary judgment, Hawkeye was granted summary judgment on the breach of contract claim in Count I of the Amended Complaint, and both Defendants were granted summary judgment on the promissory estoppel claim in Count V. The remaining counts went to trial.

The case was tried to the court over the course of nine days in April 2016, with part of one trial day dedicated to a view of the property. The parties together submitted hundreds of exhibits in binders occupying a half dozen file boxes, most of which were admitted into evidence. After the trial, the parties submitted a total of 184 pages of proposed findings of fact and conclusions of law and responses to each other's post-trial filings. The last filing is dated June 17, 2016, at which point the court took the case under advisement.

Based on the entire record, the court hereby adopts the following findings of fact and conclusions of law and renders judgment on the Amended Complaint and Emera's Cross-claim as set forth below. Unless otherwise stated, all findings are made based on a preponderance of the evidence.

*Background of the Parties and the Property*

1. Plaintiff Jay McLaughlin is the owner of a 3,200-acre parcel of mixed forest land located in Greenbush, Maine ("the Property"). Mr. McLaughlin also owns and operates a commercial logging company as well as a commercial mill.

2. Defendant Emera is the owner of a transmission line, known as Line 64, located in a corridor running through the Property. Defendant Hawkeye is a utility construction company engaged by Emera to rebuild the Line 64 transmission line.

3. The Property was purchased by Mr. McLaughlin from the Greenbush Timber Company on December 31, 1997 for $490,000.00. At the time of the purchase, a number of established unpaved wood roads were used to access the Property in conjunction with forest

harvesting operations. One of these, the Taylor Road, runs most of the length of the Property and has been the main means of vehicle access over the property.

4. Access to the Property from the nearest public road is over a 1,400-foot approach road owned by the Town of Greenbush. It runs from the public road and connects with the Taylor Road at Mr. McLaughlin's northern property boundary. Mr. McLaughlin has a deeded easement to use the Town's approach road to go between the Property and the public road.

5. After purchasing the Property in 1997, Mr. McLaughlin made a number of improvements, including rebuilding Taylor Road, using proper materials, ditches and crowning.

6. Mr. McLaughlin also engaged in extensive harvesting of wood on the Property. According to Chris Stevens, Plaintiff's forestry expert, Plaintiff harvested wood on about half of the acreage on the Property between 2001 and 2009, leaving timber still standing on the Property with an approximate market value of $626,000 as of 2009. Aerial photographs of the Property indicate forestry harvesting operations had taken place to varying degrees throughout the Property, leaving a network of skidder trails. Defendant Hawkeye Exhibits 66, 67 and 69.

7. Before any of the events giving rise to this dispute, the past logging activities conducted by the Plaintiff on the Property involved environmental violations that resulted in the imposition of fines and penalties by the Maine Department of Environmental Protection. (Defendant Hawkeye Exhibits 5, 6, 7 and 8). However, none of the environmental violations that apparently occurred during the Plaintiff's logging activity prior to 2011 has any material bearing on the issues presented, so they are not considered further.

8. The main means of access across the Property, Taylor Road, was a seasonal dirt and gravel road capable of supporting heavy equipment only during summer months and

winter months. Taylor Road was unusable by trucks and other heavy vehicles during spring mud season and the fall rainy season.

9. As of 2011, the road had not been compacted through five freeze/thaw cycles. As a result of the lack of compaction, the passage of vehicles had begun to displace the road material toward the center and to erode the shoulder of the road in places. There were depressions that resulted in puddling during rainy periods and spring thaw. In other words, the Taylor Road was in reasonably good condition, but not excellent condition, as of the beginning of 2011.

*The Line 64 Rebuild Project and the SOCA*

10. At the time of the events described herein, Emera Maine was known as Bangor Hydro-Electric Company (BHE). Sometime before February 2010, BHE decided to undertake an upgrade to its electrical service by rebuilding the Line 64 transmission line. The project became known as "the Line 64 Rebuild Project."

11. The project consisted of the rebuilding of the existing transmission line for a distance of 44 miles from Veazie to Chester and included the installation of more than` 300 new towers as well as associated conductors and hardware.

12. BHE's principal contractor for the Line 64 Rebuild Project was Hawkeye. On or about February 12, 2010, Hawkeye and BHE entered into a Supplier of Choice Agreement ("SOCA") delineating the terms and conditions of the work to be performed by Hawkeye in connection with the Line 64 Rebuild Project. Defendant Emera Maine's Exhibit 32.

13. The SOCA between BHE and Hawkeye stated, among other things, that "[Hawkeye] agrees to adhere to and comply with [BHE's] Environmental Guideline for Construction and Maintenance Activities on Transmission Line and Substation projects . . . adhere to and comply with the Environmental Specifications for Line 64 Rebuild . . . [and] be responsible for ensuring all employees, sub-suppliers, agents and representatives of [Hawkeye]

4

comply with all federal, state and local health, safety and environmental statutes, regulations, policies, guidelines and all health, safety and environmental rules as prescribed by [BHE]." Defendant Emera Maine's Exhibit 32 at 6.

14. By virtue of entering in the SOCA with BHE, Hawkeye committed itself to following specific standards and requirements in a variety of areas, including safety and environmental protection, and to "promptly correct defective deficiencies in products and services" in the course of its work on the Line 64 Rebuild Project.

15. The SOCA also required Hawkeye to use approved access roads in order to move equipment and materials to the transmission line where the work was to be performed.

16. The SOCA contained an indemnity clause pursuant to which Hawkeye agreed to indemnify BHE "from and against any liabilities, losses, expenses (including reasonable attorneys' fees), claims, demands, actions, and causes of action, whatsoever arising out of, or in any way attributable to, the operation of [the SOCA] or ancillary to [Hawkeye's] negligent provision of the Products and/or Services contemplated herein." *Id.* at 9.

17. The SOCA further provided that "[t]he provisions set forth in this [indemnity] Clause shall apply and be effective with respect to any claim, cause of action, or legal theory whatsoever including without limitation, claims based upon breach of contract, breach of warranty, failure to meet performance guarantees, tort (including negligence) and strict liability." *Id.*

18. BHE retained an environmental consulting firm, TRC Environmental, to oversee and monitor Hawkeye's work on the Line 64 Rebuild Project, especially in connection with environmental and land use issues such as erosion protection and protection of trees, wetlands, streams and other natural resources. The terms of TRC's engagement are set forth in a Master Consulting Services Agreement between BHE and TRC Environmental.

5

19. In preparation for the Line 64 Rebuild Project, BHE approached the owners of the land over which Line 64 crosses to seek the owners' permission to gain access to the transmission line and perform the reconstruction.

20. On or about July 29, 2010, Plaintiff Jay McLaughlin and BHE entered into a certain Transmission Line Access License Agreement ("License Agreement"), granting BHE and its contractors access over portions of the Property for purposes of the Line 64 Rebuild Project, in exchange for payment of $31,600 to Mr. McLaughlin. See Plaintiff's Exhibit 8.1.12. The License Agreement consists of the one-page written agreement and an attached aerial photograph of the Property labeled as Exhibit A.

21. The parties agree that the purpose of the License Agreement was to allow access by BHE, its employees, agents, and contractors, to an electrical transmission line utility corridor that crosses a portion of Mr. McLaughlin's property, with men and equipment, for purposes of the Line 64 Rebuild Project.

22. The License Agreement did not contain any seasonal restrictions on the rights of use and access it conferred on BHE and its contractors, and did not prohibit the use of the Property in March, April, May or June of 2011.

23. The License Agreement between BHE and Mr. McLaughlin stated, among other things, that "Landowner is willing to allow Bangor Hydro to enter the Property for the purpose of accessing the Transmission Line." The License Agreement, however, does not say that BHE and its contractors may go anywhere on "the Property"; instead, it limits BHE's and its contractors' rights to what the License Agreement refers to as "the Strip."

24. The License Agreement says that BHE, its employees, agents, and contractors, may "perform the following activities in the location on the Property generally depicted on Exhibit

6

'A' (the '*Strip*'), attached hereto and made a part hereof: The right to enter upon the Strip with workers and equipment and all necessary tools for the purpose of accessing the Transmission Line; and the right to improve and maintain roads over the Strip to facilitate access to the Transmission Line, including the right to install culverts with the consent of the Landowner." *Id.*

25. Because of an ambiguity in the License Agreement, the parties disagree on exactly what area is encompassed within what the License Agreement calls the "Strip" and also disagree on what rights of access over Plaintiff's property the License Agreement conferred on Emera and its contractors, including Hawkeye.

26. What makes the License Agreement ambiguous is that neither the one-page writing nor the attached aerial photograph designates any specific area of the Property as "the Strip." Exhibit A depicts roads on the Property in yellow and labels them as access roads. The yellow access roads on Exhibit A are identified as AR-21 and ARG-02, and they intersect the Line 64 transmission corridor at two points toward the southerly end of the Property.

27. The Taylor Road historically provided three points of access to the Transmission Line right of way—the two that are shown on Exhibit A and a third one north of those two. Prior to the Line 64 Rebuild Project, this northerly means of access was via what is referred to in record as the "spur road"—an unimproved woods road, little more than a skidder trail. The spur road appears to be faintly visible on Exhibit A—where the Taylor Road makes a fairly sharp (50°-60°) turn to the right on its way south, the spur continues straight ahead in a southeasterly direction toward the Line 64 transmission line corridor.

28. The License Agreement does not label the "spur road" as an access road. It does label the roads intersecting the transmission corridor in two places to the south as access roads-- AR-21 Taylor Road and ARG-02 Madden Meadows Road North. Moreover, the very

7

title of the License Agreement includes a reference to the roads designated as AR-21 & ARG-02, thereby supporting the view that the License Agreement provides access over those two roads.

29. Defendants argue that everything depicted on the exhibit attached to the License Agreement was the "Strip" and therefore BHE and its contractors could enter and pass over Plaintiff's entire property. However, the License Agreement describes "the Strip" as being "a location on the Property," so "the Strip" cannot refer to the entire Property. Plaintiff argues that the "Strip" was limited to access roads as labeled on the exhibit to the License Agreement, and did not encompass the so-called "spur" road off the Taylor Road or any other part of the Property.

30. Because the License Agreement and Exhibit A were both drafted by BHE or on its behalf, the ambiguity must be construed in favor of Plaintiff McLaughlin and against BHE. When contract language is ambiguous, it must be interpreted according to its plain and commonly accepted meaning. *Flaherty v. Muther*, 2013 ME 39, ¶ 17, 65 A.3d 1209; *Cookson v. Liberty Mut. Fire Ins. Co.*, 2012 ME 7, ¶ 8, 34 A.3d 1156.

31. The court finds and concludes that the License Agreement did not grant BHE or its contractors the right to access the transmission line corridor from Taylor Road via the Taylor 1 spur road. Based on the entire record, the court construes the License Agreement to grant BHE and its contractors access over roads labeled "ACCESS ROAD" on the exhibit, not to grant BHE or its contractors access over the spur road.

32. However, during Hawkeye's work on the Property, Mr. McLaughlin gave oral permission for BHE and Hawkeye to use the spur to gain access to the transmission corridor. Based on this permission, Hawkeye used the Taylor 1 spur road extensively to access the Line

8

64 project, and made extensive changes to the spur road, widening and grading it, and essentially converting it from a skidder trail to a gravel road suitable for heavy equipment.

33. After Hawkeye had finished its work on the Property and moved on, Mr. McLaughlin met with representatives of BHE and Hawkeye and asked for some restoration work to be done on the spur road. Hawkeye arranged for a local road contractor, Sunset Development, to put gravel on the spur road to make it more suitable for Plaintiff's wood harvested operations.

*Hawkeye's Work on the Property*

34. In November 2010, before Hawkeye had begun accessing the Property for purposes of the Line 64 Rebuild Project, BHE and its consultant, TRC, went there for the purpose of documenting the condition of the designated access roads as well as the spur, and marking their location. TRC took a number of photographs that show stretches of the Taylor Road not being in good condition throughout, likely as a result of not having been compacted during the previous five cycles of freezing and thawing. See Plaintiff's Exhibit 10.9.6.

35. Taken as a whole, the photographic evidence and testimony indicate that there were crowns and ditches and other features of a well-maintained, functional road in some places, but not in others. The condition of the Taylor Road was somewhere between the poorly maintained condition that Emera and Hawkeye ascribe to it and the excellent condition that Plaintiff ascribes to it.

36. Pursuant to the License Agreement, BHE's contractor, Hawkeye, commenced its construction activities by using Taylor Road and other roads on Plaintiff's property for access to Line 64. *See* Plaintiff's Exhibit 4, ¶27.1.3. Hawkeye began operations on the Property in March 2011 and used the Property to access Line 64 for the next six or seven weeks.

37. Before Hawkeye began to send truck and other heavy vehicles over the roadways on the Property, Hawkeye installed erosion controls at strategic locations along the Taylor Road. These controls included timber mats, silt fencing, hay bale check dams, seeding and mulching. Josh Teel of Hawkeye and Gil Paquette and Paul Corey of TRC monitored, maintained, and enhanced the erosion controls throughout the period of time that the Taylor Road was used by Hawkeye. The controls were frequently inspected and upgraded, especially after rain events, to assure that they were continuing to function as controls over the unreasonable discharge of sediment into protected natural resources.

38. Although Plaintiff's expert, Norman Turner, documented problems with the erosion controls installed by Hawkeye, his initial observations did not come until June 2011, several months after Hawkeye's last activity on the Property. His observations regarding the deteriorated state of some of Hawkeye's erosion control installations do not necessarily reflect anything other than the passage of time. On the other hand, Mr. Turner's testimony and photographs did establish that some of Hawkeye's erosion control measures failed to control the movement of earth material and water from the roadway into the woods.

39. There is no doubt that Hawkeye's vehicles and equipment did considerable damage to the Taylor Road during the six or seven weeks during the late winter/early spring that Hawkeye was using the road. The road was thawing, if not thawed, and was already soft due to the lack of compaction over the prior several years. How many vehicle trips were made over the Taylor Road is not indicated in the evidentiary record, but it must have been in the hundreds, if not thousands, of trips. The vehicles ranged in size from pickup trucks to multi-ton heavy trucks and trailers.

10

40. One of Hawkeye's practices that was particularly destructive to the road surface was the dragging of heavy wooden pallets, known as "mats," along Taylor Road to the transmission line. Each mat was 16 feet by 4 feet and weighed about 1,500 pounds.

41. A former equipment operator for Hawkeye, Gordon Boyington, testified that mats would be stacked high and dragged along the muddy road, moving large quantities of material off the crown and middle of the road onto the shoulder and into the surrounding forest.

42. The purpose of mats is to provide additional support for vehicles and equipment, and also to protect sensitive areas, such as wetlands and streams. BHE's Environmental Guidelines for Construction and Maintenance Activities on Transmission Line and Substation Projects includes a section on the use of mats:

> "BHE construction projects require that adequate mats are present at the project site prior to construction. A readily accessible source of mats should also be available in case construction conditions change and necessitate the need for more mats." Plaintiff's Exhibit 1 at 10, ¶ 4.3.

43. The same document contains a specific warning against dragging mats as opposed to transporting them: "Whenever possible, mats should be carried and not dragged. Dragging mats creates more soil disturbance which requires additional erosion control or final restoration work." Plaintiff's Exhibit 1 at 11. Hawkeye asserts that this reference discourages dragging of mats only in environmentally sensitive areas, but the specifications do not contain that limitation. Even if, as Hawkeye points out, the specifications did not prohibit the dragging of mats except in environmentally sensitive areas, the evidence plainly showed that Hawkeye's practice of dragging mats along the Taylor Road did substantial damage to the road, mainly by moving material to the sides, into ditches, and even entirely off the roadway.

44. Hawkeye's bid on the Line 64 Rebuild Project included far fewer mats than competing bids for the job. Hawkeye's bid included slightly over $2 million for mats, whereas competing bids from PAR Electric and 3 Phase Electrical Contractors had been between $17

11

million and $33 million.  See Plaintiff's Exhibit 10.5.1.c.7 and 10.5.1.c.7.a.   Hawkeye's $2 million would purchase between 5,000 to 7,000 mats at a price of $285 to $400 per mat.  BHE was supposed to provide an additional 3,000 mats, but due to a supply problem only provided a fraction of that amount.  See Plaintiff's Exhibit 10.5.1.c.9.   The BHE/Hawkeye/TRC weekly meeting minutes and the TRC monthly initiative status reports made reference to a shortage of mats. Plaintiff's Exhibit 10.5.1.c.11 and 10.5.1.c.12.

45.  Hawkeye evidently did place mats in selected locations on the Taylor Road as well as on the transmission line, but the Taylor Road was never completely covered with road mats during construction.  Had it been, the damage to the road would have been lessened.  However, nothing in any of the extensive exhibits on record specifically requires mats to be installed on the entire length of access roads.

46. Another practice that displaced material from the road was Hawkeye's practice of using bulldozers to scrape loose, muddy material off the surface so as to create a hard travel surface.  Hawkeye's equipment moved the loose material to the roadsides, similar to how plows move snow onto the side of a road.  Mr. Boyington testified to how his and other bulldozers moved—the Plaintiff's preferred term is "spewed"—quantities of gravel, mud and other material from the road onto the shoulders of the road, into ditched areas and even a short distance into the surrounding woods.

47. Plaintiff's evidence established persuasively that Hawkeye's operations did displace material from the road onto the shoulders and into ditches, where ditches existed.   On the other hand, although the Plaintiff contends that material from the road was deposited far into the woods throughout the length of Taylor Road, neither the evidence nor logic bears out that contention.  There are woods on either side of the road for almost its entire distance—material flung outward from the road could not travel very far before hitting trees and branches and

12

dropping. Also, the court's view of the property did not indicate that trees on either side of the Taylor Road were dead or dying or seemingly at risk of dying, as the expert evidence indicated would be the case if their root systems had been smothered under large quantities of sediment, mud or other material. In some locations along Taylor Road, however, muddy material moved long distances into the woods, not because it was flung there, but because it was carried there with the flow of water off the road.

48. Hawkeye regularly took steps to repair the damage to the road caused by the passage of vehicles and mats and by the scraping of mud to the side. On a virtually daily basis, Hawkeye had bulldozers or backhoes "backdragging" the rutted and damaged sections of Taylor Road. Backdragging involves dragging the bucket backward, thereby bringing loose material back into ruts and leveling the surface of the road. Backdragging helped smooth ruts and enabled material that had been pushed to the sides of the road to be brought back toward the middle.

*Hawkeye's Remediation Work*

49. In addition to installing and maintaining erosion control measures and performing periodic repair of damage to the Taylor Road during its work on the Property, Hawkeye retained a local road contractor, Sunset Development, to do further repair and restoration work on the Taylor Road.

50. Over a six-week period, Sunset Development did the following to repair and restore the Taylor Road: installed an additional 3,000 cubic yards of screened gravel at various locations along the Taylor Road, covering a mile of road; raked, graded, and compacted the Taylor Road; restored the crown to the Taylor Road; recreated ditches along stretches of the Taylor Road; removed the erosion controls that had been installed by Hawkeye; removed

13

material from alongside of the road, and installed nine culverts in order to restore the drainage system to the road. Sunset Development was paid a total of $55,100 for this work.

51. In November 2011, there was a meeting attended by Jay McLaughlin to discuss the remedial measures that needed to be completed in order to address Mr. McLaughlin's concerns. As a result of that meeting, Gil Paquette, the environmental compliance manager for BHE, developed a punch list to Hawkeye.

52. The punch list called for additional gravel on the Taylor 1 spur road, in order to upgrade and improve that road. Hawkeye asked Sunset Development to do that work, which resulted in an additional payment of $5,000 to Sunset Development.

53. Mr. McLaughlin had numerous conversations with Mr. Paquette and Mr. Quigley about damage to trees and plants along the Taylor Road and about the deposit of material from the road into the surrounding woods. During one of those conversations, Mr. Quigley indicated that Hawkeye would consider clearing material out of the woods using a vacuuming system. However, Hawkeye did not follow through on that idea.

54. Mr. Quigley and Mr. McLaughlin did a damage assessment of the trees and vegetation along Taylor Road and came up with a total of 4,448 items. However, Hawkeye later retained John Kolenik, a licensed professional forester with Prentice & Carlisle of Bangor, Maine, to do an evaluation of damage to trees and plants along Taylor Road. Mr. Kolenik made an inspection of tree damage along the Taylor Road and determined that the forfeiture value of trees that were damaged, using the timber trespass statute, was $1433.18, and that the market value of the roadside trees damaged by Hawkeye's operations was minimal.

*Plaintiff's Theories of Liability*

55. This section addresses the legal grounds on which the Plaintiff seeks to recover damages from the Defendants. As noted above, the claims of Plaintiff that went to trial were as

14

follows: Count I--Breach of Contract (Emera only); Count II—Negligence; Count III—Injury to Land and Forest Products (14 M.R.S. §7552); Count IV—Trespass to Land (14 M.R.S. §7551-B), and Count VI—Trespass concerning the "spur road." Plaintiff has the burden of persuasion on all of its claims, as to both liability and damages. Defendants deny liability and dispute damages on all of the Plaintiff's claims.

56. The contract applicable to Count I is the Transmission Line Access Licensing Agreement between BHE and Mr. McLaughlin. Other than the ambiguity relating to "the Strip," the provision most relevant to this case appears at paragraph 4: "Bangor Hydro shall repair, or cause to be repaired, any damage to the Property caused by Bangor Hydro beyond normal wear and tear." The phrase "beyond normal wear and tear" is admittedly somewhat ambiguous. However, the conduct of the parties during and after the Line 64 Rebuild Project resolves the ambiguity. The evidence is clear that Hawkeye (with the support and concurrence of BHE) undertook to restore the McLaughlin Property to what was substantially its condition before Hawkeye's work, and to compensate Mr. McLaughlin for what could not be restored (such as damaged or destroyed trees).

57. As an example, the TRC environmental compliance manager, Gil Paquette, who was acting on behalf of BHE, prepared a "punch list" after a meeting and inspection of the property with Mr. McLaughlin in November 2011, after Hawkeye had left the property. The "punch list" indicates that BHE and Hawkeye understood that their obligation was to repair and restore to its condition (apart from "normal wear and tear") before Hawkeye's work began, and to compensate the Plaintiff for what could not be repaired and restored. Accordingly, the court will evaluate Plaintiff's breach of contract claim against Emera using that template for determining breach and damages.

58. Count II of the Amended Complaint asserts a claim against Defendants for negligence. A claim for negligence may prevail where a plaintiff proves that the defendants

15

owed plaintiff a duty, the duty was breached, and that plaintiff was injured. *Grant v. Foster Wheeler, LLC*, 2016 ME 85, ¶ 14. Where the duty asserted by a plaintiff derives from a contract, there must be an extra-contractual duty in order for Plaintiff to succeed on a claim for negligence.[1]

59. Plaintiff claims that the license provided by the License Agreement is analogous to an easement and, like an easement, imposes a duty upon the license holder to reasonably use the property. In a license agreement, the rights and obligations of the parties are limited to those rights and obligations described in the agreement. "In interpreting [a license] contract the ordinary rules of construction apply. The primary purpose is to determine 'what intention or purpose is expressed by the words and phrases used. It is that meaning by which the parties are bound, even though one or the other honestly believed the language to have a different meaning.'" *4-One Box Machine Makers v. Wirebounds Patents Co.*, 131 Me. 356, 163 A. 167 (Me. 1932) (citations omitted). There is no legal support for the contention that the granting of a license automatically creates a non-contractual duty.

60. Plaintiff further argues that he is owed a duty of care by Defendants, akin to a fiduciary duty, as a result of the "special relationship" between him and Emera and/or Hawkeye. Plaintiff alleges that the special relationships arise from contract requiring Defendants to protect Plaintiff from damage. "Special relationships for purposes of a negligence claim are grounded in the notion that a person or entity owed the plaintiff a fiduciary duty. A fiduciary duty will be found to exist where the law will recognize both the disparate positions of the

---

[1] "There are situations where the breach of a contractual duty may also give rise to a tort action: But in such cases, the injury to the plaintiff has been 'an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted benefit.' . . . 'In order to maintain an action ex delicto because of a breach of duty [arising] . . . out of a contractual relation, the breach must be shown to have been a breach of a duty imposed by law and not merely . . . [the same duty] imposed by the contact.'" *L. L. Bean Inc. v. Metro-Autospan, Inc.*, No. CV-88-1362, 1989 Me. Super. LEXIS 250, *13-14 (Dec. 11, 1989) (citing *Long v. Jim Letts Oldsmobile, Inc.*, 135 Ga. App. 293, 217 S.E.2d 602, 604 (Ga.Ct.App.1975)).

16

parties and a reasonable basis for the placement of trust and confidence in the superior party in the context of specific events at issue." *DeCambra v. Carson*, 2008 ME 127, 953 A.2d 1163 (Me. 2008). In this case, Plaintiff has not proven the existence of a special relationship between him and either of the Defendants.

61. However, the negligence claim in Count II is likely the only claim under which the Plaintiff can seek to hold the Defendants liable for altering the 1400-foot approach road to his property owned by the Town of Greenbush. The License Agreement does not cover the approach road because it is not Plaintiff's property. For the same reason, the Defendants cannot be held liable on a theory of trespass, either at common law or by statute, to the Plaintiff. On the other hand, Plaintiff's claim regarding the approach road—that the Defendants left the approach road unusable by Plaintiff's heavy trucks and equipment—is cognizable on a negligence theory. The Defendants owed Plaintiff a duty to use reasonable care not to cut off Plaintiff's access to his own property by rendering the approach road impassable by his vehicles. Defendants plainly knew or should have known that the Plaintiff's logging operations employ heavy trucks and equipment, and that the approach road constituted Plaintiff's primary means of access to his property. Thus, the negligence claim is the sole basis in the Amended Complaint on which the Defendants can be held liable to Plaintiff with regard to the approach road.

62. The negligence claim in Count II also applies to Hawkeye's work on the Property, given that there is no contract defining Hawkeye's duties to Plaintiff. The law imposes a duty of care to avoid causing physical injury or damage to another person or another person's property.

63. Count III of the Amended Complaint asserts Plaintiff a claim under 14 M.R.S. § 7552, which prohibits "[c]ut[ting] down, destroy[ing], damage[ing] or carry[ing] away any forest product, ornamental or fruit tree, agricultural product, stones, gravel, ore, goods or property of any kind from land not that person's own, without permission, and provides for damages of up

17

to three times actual damages. *See id.* § 7552(2)-(4). Plaintiff's section 7552 claim is that, without permission, Hawkeye and/or Emera removed or damaged trees and forest products on the Property and are therefore subject to statutory damages.

64. Count IV of the Amended Complaint asserts a claim under 14 M.R.S. § 7551-B, which imposes liability for intentionally entering another person's property without permission and "damag[ing] any road, drainage ditch, culvert, bridge, sign or paint marking . . ." *Id.* § 7551-B(1)(A). Intentionally caused damage subjects the responsible person to double damages. *Id.* § 7551-B(2). This count is relevant to the Plaintiff's claims for damage to the Taylor Road and the Taylor 1 spur road.

65. The fact that, by virtue of the License Agreement, Plaintiff granted BHE and Hawkeye license to enter and travel over the Property does not preclude him from asserting the statutory trespass and damage claims in Counts III and IV against Emera and Hawkeye. Because the Plaintiff's essential contention is that BHE and Hawkeye exceeded and violated the terms of entry and use permitted by the License Agreement, he is entitled to pursue the statutory remedies to the extent that his Property was entered beyond what was permitted, and to the extent his Property was damaged beyond "normal wear and tear" and not restored.

66. Lastly, Count VI of the Amended Complaint asserts what appears to be a common law trespass claim against both Defendants, claiming that they entered and used the Taylor 1 spur road without Plaintiff's permission, and also that they converted the spur road, which the Amended Complaint says had been only a "twitch trail" or skidder trail not suitable for vehicle travel, into a graveled road, without Plaintiff's consent.

*Evidence Regarding Liability and Damages*

67. This section of this Decision analyzes the evidence as to each of the areas of breach and damage that the Plaintiff alleges. He asserts that the Defendants are liable for damages as follows:

18

- for damage regarding the 1400-foot long approach road owned by the Town of Greenbush

- for damage to the gate at the entrance to Plaintiff's property

- for damage to Taylor Road and the roadside areas

- for damage associated with material "spewed" into the woodland on either side of Taylor Road

- for damage to trees and other vegetation along Taylor Road and the spur road

- for trespass and damage to the Taylor 1 spur road

68. Plaintiff contends that the 1400' approach road to Plaintiff's property was rendered unusable because the large cobblestones used to repair the road prevent his company's heavy trucks and other logging equipment from safely traveling the approach road. The License Agreement does not apply to the 1400' approach road because it is not part of Plaintiff's Property.

69. However, the evidence indicated that BHE and Hawkeye acknowledged responsibility for the approach road; even had they not done so, as noted above in the discussion of Plaintiff's negligence claim, they owed Plaintiff a duty not to interfere with his access to his property. The applicable legal principle is that users of an easement (Emera and Hawkeye in this case) can be liable in negligence to another user (Plaintiff in this case) for causing physical damage to the easement property that impairs or precludes the other user's access.

70. The Defendants also point out that the Plaintiff himself placed the cobblestone that he complains of, but the evidence established that Plaintiff did so for purposes of creating a base layer only, over which a surface layer of gravel was to be installed. In fact, Gil Paquette, the TRC consultant monitoring the project on behalf of Emera, confirmed the need for gravel in an email message to Hawkeye's project manager, Patrick Quigley, dated November 30. Titled

19

"Taylor Road Punch List," Mr. Paquette's message lists as the first item "Cobble near beginning of Taylor Road should be graveled." The court finds that this was a directive to Hawkeye to place gravel over the cobblestone on the approach road, and that Hawkeye failed to follow through—an omission for which both Defendants are legally responsible to Plaintiff.

71. Defendants point out that the approach road was repaired to the satisfaction of the Town of Greenbush, owner of the land over which the approach road runs, upon the completion of activities on the Approach Road. (Trial Tran. Vol. 4, p. 220:12-14). However, the Town's approval is only evidence and not a bar to Plaintiff's claim. There is no indication that the Town cares whether the approach road is passable for Plaintiff's heavy vehicles.

72. The evidence showed the cost of completing the approach road was $22,000, so Plaintiff is entitled to recover damages against both Defendants in that amount. The award is made against both Defendants jointly and severally based on the Count II negligence claim.

73. For purposes of Emera's cross-claim against Hawkeye, the court finds and concludes that Hawkeye was solely responsible for negligently causing damage to the approach road and for failing to install the gravel surface layer that would have made the approach road passable for Plaintiff's vehicles. Emera's joint and several liability is based solely on the fact that it was Hawkeye's principal for purposes of Plaintiff's negligence claim.

74. Plaintiff alleges that Defendants caused damage to the gate leading into the Taylor Road system and that Defendants failed to repair the damage in violation of the License Agreement. Gordon Boyington, who originally made the gate for the prior owner, was hired by Hawkeye to repair the gate. Mr. Boyington testified that after his repairs, the gate was in as good condition as it had been before Defendants entered the property. Plaintiff failed to prove that either Defendant is liable to him for damages with respect to the gate.

20

75. With regard to damage to the Taylor Road, Plaintiff contends that many culverts on Taylor Road and Madden Meadows Road North were damaged by Defendants, that Defendants failed to remediate the damage in accordance with the License Agreement, and that Defendants are in breach of the License Agreement for failing to remediate. Plaintiff looks to Gil Paquette's "punch list" for support to this claim. Plaintiff also points out that Sunset Development, hired by Hawkeye to remediate, were hired only for selected areas, not for the entire property. *See Testimony of Joseph Reinzo* (Trial Day 8) at 120-26. Defendants argue that the work of Sunset Development put the roads in better condition than they had been before the License Agreement.

76. Based on all the testimony, the photographic evidence of the condition of the road and adjacent ditched areas before and after Hawkeye's work, as well as the view of the property, the court finds that Sunset Development's work has repaired the road damage resulting from Hawkeye's work, repaired the culverts, and restored much of the ditching that was filled in with road material moved there by the passage of vehicles and mats, and by Hawkeye's periodic scraping off of muddy material. However, Sunset only completed work on select portions of the Taylor Road, and there remain sections of filled-in ditching that have yet to be restored. These sections of filled-in ditching on either side of the Taylor Road, if added together, total about one mile.

77. Based on Sunset having been paid about $55,000 for all the work that it did, the court finds that the sum of $20,000 reflects a reasonable approximation of the cost to restore the ditching still in need of restoration. Plaintiff's evidence did not show unrestored or unrepaired damage beyond that, so the award for this item of damage is limited to $20,000. Plaintiff did not prove that the Defendants damaged Taylor Road intentionally for purposes of the double damages provision at section 7551-B. The double damage provision covers

21

situations involving damage to property committed in order to cause damage, such as vandalism. The damage in question—filled-in ditches—was not intentional, because it resulted mainly from Hawkeye's efforts to move vehicles and mats along Taylor Road, and to scrape mud off the surface of Taylor Road. As noted above, Hawkeye made some effort to remediate the damage, both at the time through backdragging, and afterward by retaining Sunset Development.

78. Therefore, Plaintiff is entitled to an award of actual damages of $20,000, measured by the cost to repair the Taylor Road, specifically by removing material from filled-in ditching. The award is made against Emera and Hawkeye jointly and severally. The award is made on Count I against Emera only, but jointly and severally against both Defendants on Count IV, the Plaintiff's section 7551-B claim.[2]

79. For purposes of Emera's cross-claim against Hawkeye, the court finds and concludes that Hawkeye is solely responsible for the acts and omissions resulting in this damages award—namely the insufficient repair of filled-in ditching—and that Emera's joint and several liability is based solely on the fact that it was Hawkeye's principal and was the obligor to Plaintiff on the License Agreement provision requiring repair.

80. With regard to Plaintiff's claim about material from Taylor Road being "spewed" into the surrounding woodland, the court finds that, although Norm Turner's testimony does indicate that a quantity of material ended up in the woods, the evidence does not substantiate Plaintiff's claim that the material needs to be removed. Plaintiff's soil science expert, Steven Howell, testified that some material from the road has been detected at test borings, but the evidence does not establish the quantity of road material present on the forest floor, either by

---

[2] Plaintiff's prayer for relief in Count IV does not specifically request damages relating to damage to the roads; it requests damages for "whatever sums are reasonable in the premises," including damages for the loss of forest products and trees and diminution in value of real estate. However, the specific reference to forest products and trees is not a limitation on damages.

area or by depth. *Testimony of Steven Howell* (Trial Day 6) at 140, 145-46. Based on the testimony of Rodney Kelshaw, a soil scientist hired by Hawkeye, it is doubtful that material from the road was deposited anywhere near as extensively or as widely as Plaintiff contends. *Testimony of Rodney Kelshaw* (Trial Day 5) at 260-61.

81. As to Plaintiff's claim in Counts III and IV of the Amended Complaint that the road material deposited in the woods has caused, is causing, or will cause, damage to trees, the evidence did not support the claim. Based on the testimony of Emera's forestry expert, David Irving, and the court's own observations during the view, the court finds that the trees on the Property are generally healthy and productive, with no visible signs of damage due to the presence of material from the road. *See, e.g., Testimony of David Irving* (Trial Day 5) at 192 ("I thought the condition of the trees was very good all along the length of the road").

82. Plaintiff argues that, because a reference to removing material from the woods by means of a vacuum truck appears in a communication from Gil Paquette to Patrick Quigley, BHE and Hawkeye have acknowledged the need to vacuum miles of woods on either side of the Taylor Road. Mr. Quigley did evidently tell Mr. McLaughlin Hawkeye was willing to consider doing some vacuuming in the woods, but his statement was not specific as to how much or in what areas vacuuming would be performed, so it is not sufficiently integrated to be binding in any contractual sense on either Emera or Hawkeye.

83. In sum, Plaintiff failed to prove either that whatever quantity of material was deposited in the woods along Taylor Road has caused, is causing or will cause, any damage to the trees, and therefore failed to prove that he is entitled to any damages for the cost of removal or any other measure of damages.

84. Plaintiff also claims that, even apart from material being deposited into the woods, the Line 64 Rebuild Project caused significant damage to trees along the roadway and that

23

Defendants failed to repair the damage or reimburse Plaintiff for the trees. In support of his claim, Plaintiff points to the count that he and Patrick Quigley prepared after Hawkeye had left the Property. They counted 4,448 damaged or destroyed trees or other vegetation along the road, but they did not produce any inventory indicating the size or species of any of what they counted.

85. Mr. Kolenik, Hawkeye's retained forester, also did a count of damaged trees along the road on the Property and found that only 54 trees measuring two inches or more were damaged. Using statutory forfeiture amounts and market value, he calculated that the damaged stems had a total value of $1,433.18. *See Testimony of John Kolenik* (Trial Day 3) at 243, 252-53. Hawkeye issued Plaintiff a check for that amount that was accepted. Defendants contend that any damage caused to the trees was fully remedied by the check previously issued to Plaintiff.

86. The only rational explanation for the vast difference between the number of damaged trees counted is that Mr. McLaughlin and Mr. Quigley counted everything, no matter how small, whereas Mr. Kolenik counted only trees above two inches in diameter—those that had market value or were compensable under the timber trespass statute, *see* 14 M.R.S. § 7552; 17 M.R.S. § 2510.

87. Section 7552 provides for damages as follows:

3. Measure of damages. This subsection governs the measurement of damages resulting from a violation of subsection 2.
   A. When agricultural or forest products have been destroyed or carried away, the owner may recover as damages either the value of the lost products themselves or the diminution in value of the real estate as a whole resulting from the violation, whichever is greater.
   B. Except within areas that have been zoned for residential use, for lost trees the owner may choose to claim:
      (1) The market value of the lost trees;
      (2) The diminution in value of the real estate as a whole resulting from the violation;

(3) The forfeiture amounts determined in Title 17, section 2510, subsections 2 and 3; or

(4) If the lost trees are ornamental or fruit trees, the costs of replacing, replanting and restoring the trees with trees of comparable size and the same or equivalent species and the actual costs for cleanup of damage caused during the cutting.

In addition, the owner's damages for lost trees that are not ornamental or fruit trees may include the costs for regeneration of the stand in accordance with Title 12, section 8869.

The court may reduce the damages awarded for good cause shown when the cutting of trees was done negligently or without fault.

Public utilities, as defined in Title 35-A, section 102, and contractors performing work for public utilities are not liable for damages under this paragraph for lost trees the trimming or removal of which is necessary to provide safe and reliable service to the customers of the public utilities.

14 M.R.S. § 7552(3).[3]

88.     The timber trespass statute referenced in section 7553(3) makes it a civil violation to harvest a tree without the owner's consent, and establishes "forfeiture amounts" for unlawfully harvested trees of more than two inches in diameter at a height of four and a half feet above ground. *See* 17 M.R.S. § 2510(1)-(3). The owner of unlawfully harvested trees is entitled to restitution for "financial loss" over and above the forfeiture amounts. *See id.* § 2510(4).

89.     Plaintiff seeks damages for the value of the 4,448 trees and plants counted by him and Mr. Quigley and also damages for "regeneration of the stand," as permitted by section 7752(3)(B)(1) and (4). Plaintiff's claim appears to assume that all 4,448 trees and plants counted by Mr. McLaughlin and Mr. Quigley were of sufficient size to have market value, but the evidence simply does not establish that point. The court does not view the two-inch diameter provision of section 2510 as meaning that smaller trees have no market value, but Plaintiff's

---

[3] Section 7552 exempts public utilities and their contractors from liability for cutting or removing trees if "the trimming or removal . . . is necessary to provide safe and reliable service to the customers of the public utilities." The exemption does not apply here because there is no evidence that any damage to the Plaintiff's trees was necessary to provide safe and reliable service to BHE's customers.

25

evidence was insufficient to prove that he is entitled to damages due to the loss of any particular number of trees or plants, either in terms of forfeiture value or in terms of market value. Accordingly, the court adopts Mr. Kolenik's analysis in full and concludes that Plaintiff has not proved he is entitled to compensation for damage to trees beyond the amount Hawkeye has previously paid.

90.     The last area in which Plaintiff claims damages has to do with the alleged trespass on the Taylor 1 spur road and the alleged unpermitted widening and improvement of the Taylor 1 spur road. Conceptually, these are two distinct claims—one is based on unpermitted entry and use and the other is based on unpermitted alterations.

91.     "A person is liable for common law trespass 'irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally enters land in the possession of the other, or causes a thing or a third person to do so.'" *Medeika v. Watts*, 2008 ME 163, ¶ 5, 957 A.2d 980 (Me. 2008). As noted above, the court finds that the License Agreement did not confer any right on BHE or its contractors to use the Taylor 1 spur road to access the transmission line, but that Mr. McLaughlin gave oral permission to BHE and Hawkeye to do so. Plaintiff argues that oral permission was insufficient and that his written consent was required. However, as Emera points out, Plaintiff was not more than an unintended, incidental beneficiary of the agreement between Hawkeye and BHE that did require any modification to be in writing. Accordingly, Plaintiff has not proved that their use of the Taylor 1 spur road was a trespass.

92.     As to the alterations, the court finds and concludes that Plaintiff has not proved that either Defendant is liable to him for damages. First, in granting oral permission for Defendants to bring heavy equipment and vehicles over what was then a skidder or twitch trail only, Plaintiff had to have known that they would need to improve it substantially, by widening

26

it and installing gravel and other road material. Hawkeye did convert the trail into a serviceable road, thereby improving Plaintiff's access to various parts of the Property. The improvement and resulting benefit to Plaintiff's property could serve as consideration for his oral agreement that Hawkeye and BHE could use the trail as a means of access to the line.

*Emera's Cross-Claim Against Hawkeye*

93. Emera has filed a cross-claim against Hawkeye, seeking indemnification against any damages awarded against Emera and Emera's attorney fees and costs incurred in defense of the case.

94. Emera's indemnification cross-claim is based on the indemnity provisions at section 16 of the Supplier of Choice Agreement (SOCA) between Emera's predecessor, BHE, as Purchaser and Hawkeye as Seller of the services and products encompassed in the SOCA. Section 16.2 of the SOCA reads as follows:

> 16.2 The Seller agrees to indemnify, release and save harmless the Purchaser, its directors, officers, servants, agents or employees, and their heirs, executors, administrators, successors and assigns, or any of them, from and against any liabilities, losses, expenses (including reasonable attorneys' fees), claims, demands, actions and causes of action, whatsoever arising out of, or in any way attributable to, the operation of this Agreement or ancillary to Seller's negligent provision of the Products and/or Services contemplated herein. The indemnification obligation set forth in this Clause shall not apply to the extent that injuries, death, loss, damage or destruction is caused by the sole negligence or willful misconduct of Purchaser or its employees. In the event any loss or damage results from the concurrent negligence of Purchaser and Seller, each Party shall be responsible for its proportionate share of fault as well as defense costs.

95. Hawkeye raises several objections to Emera's cross-claim.

96. First, Hawkeye asserts that Emera's cross-claim is barred because BHE made final payment to Hawkeye and released its claims. Hawkeye asserts that the letter of final payment issued by the TRC consultant, Gil Paquette, on behalf of BHE and dated March 1, 2012 operates to preclude Emera from asserting any claim under the SOCA for indemnification. Neither the final payment letter nor the SOCA supports Hawkeye's position. The court finds

27

and concludes that Emera's cross-claim is not barred by release or accord and satisfaction or any other bar.

97. Second, Hawkeye points out that its duty to indemnify BHE under the SOCA is limited when the damage or loss is due to BHE's sole negligence or fault, or due to concurrent negligence or fault on the part of BHE and Hawkeye. The court has already found and concluded, for purposes of Emera's cross-claim against Hawkeye, that the damages awarded to Plaintiff in this case arise from acts or omissions for which Hawkeye is solely responsible, and that Emera's joint and several liability for those damages is based solely on the fact that it was Hawkeye's principal and the obligor on the License Agreement.

98. Third, Hawkeye responds to Emera's claim as to its costs of defense by asserting that Emera has waived any right to recover costs of defense because it elected to mount its own defense rather than tendering the defense to Hawkeye. Whether an indemnitee must tender the defense of a covered claim to the indemnitor in order to preserve the right to recover costs incurred in defense of the claim appears to be an open question under Maine law.

99. There is authority elsewhere to the effect that an indemnitee's failure to tender the defense constitutes a waiver of the right to indemnification against the costs of defense, although not a waiver of the right to indemnification on liability for damages. *See* 2-21 COMMERCIAL AND CONSUMER WARRANTIES § 21.09 ("vouching-in" defendant in a Uniform Commercial Code action must tender defense to vouchee; "if the defense is not tendered, it means that the potential voucher will not be able to recover attorney's fees and costs."); 1-5 CONSTRUCTION INSURANCE: COVERAGES AND DISPUTES § 5-2 (discussion of effect of insured's failure to tender defense on ability to recover costs of defense from insurer); Annot. 53 A.L.R.4th 414 (discussion of need to tender defense in product liability actions).

100. In an illustrative opinion, the district court in *Itzep v. Target Corporation*, noted, "Under Minnesota law, a defendant's failure to tender the defense precludes an award of attorney's fees for the defense. Further, filing a cross-claim against a co-defendant for indemnity does not amount to tender of the defense." 2010 U.S. Dist. LEXIS 55185 *60 (W.D. Tex. 2010) (citations omitted).

101. On the other hand, as Emera points out, Maine law does not establish any general duty on the part of an indemnitee to tender the defense of a covered claim in order to obtain indemnification for the costs of defense. Moreover, nothing in the SOCA indemnity section makes the indemnitee's tender of the defense of a claim a requirement or prerequisite to indemnification. Also, Hawkeye has not shown that it has been prejudiced in any way by Emera's failure to tender the defense. As Emera points out, Hawkeye could have asked Emera to tender the defense, particularly in light of Emera's cross-claim, which plainly put Hawkeye on notice that Emera was seeking indemnification for costs of defense as well as for any damages.

102. When an indemnity contract is unambiguous and imposes no requirement that the indemnitee tender the defense, and where the absence of a formal tender has not prejudiced the indemnitor in any cognizable way, the indemnity contract should be interpreted and enforced according to its unambiguous terms without the imposition of additional terms that the parties did not bargain for. *See Devine v. Roche Biomedical Lab., Inc.*, 637 A.2d 441, 446 (Me. 1994) ("Like any other terms of a contract, indemnity provisions should be interpreted according to their plain, unambiguous language"). Accordingly, Emera's cross-claim as it relates to costs of defense is not precluded.

103. If any one or more of the claims of the Plaintiff were based solely on the alleged negligence or other fault of BHE or the concurrent negligence or other fault of BHE and

29

Hawkeye, Emera's right to recover costs of defense would be limited accordingly. However, the court finds and concludes that all of the Plaintiff's claims in this case, including those for which this Decision does not award any damages, stem from the acts or omissions of Hawkeye, as BHE's agent, rather than acts or omissions of BHE solely or acts of Hawkeye and BHE concurrently. For example, it was Hawkeye, not BHE, that dragged mats and scraped mud off Taylor Road into ditches and woods.

104. For these reasons, Emera will be granted judgment against Hawkeye on the cross-claim for indemnification of both costs of the defense and the joint and several damages awards.

*Conclusion*

For purposes of the Amended Complaint, the court finds and concludes as follows:

- Plaintiff proved that he is entitled to an award of damages for the cost of restoring the approach road and for the cost of completing the work on ditches along the Taylor Road, totaling $42,000. He also proved a violation of 14 M.R.S. § 7551-B with respect to the ditching along Taylor Road, and is entitled to an award of attorney fees and costs.

- Plaintiff has been fully compensated for any cognizable loss or damage to his forest products and woodland.

- Plaintiff did not prove that he is entitled to damages or further compensation for damage to the Taylor Road entry gate; remediation of siltation; other repair to Taylor Road; damage to any culverts; or additional loss of forest product and woodland. Plaintiff also did not prove that either Defendant is liable for any diminution of the value of his property.

- Any damage to the road and culverts has been repaired and remediated as required by the License Agreement and applicable law

The court's awards on each count of the Amended Complaint are as follows:

- On Count I (Breach of Contract, License Agreement) of the Amended Complaint, judgment is awarded to Plaintiff against Defendant Emera Maine in the amount of $20,000.

30

- On Count II (Negligence) of the Amended Complaint, judgment is awarded to Plaintiff against Defendant Emera for $22,000 and against Defendant Hawkeye for $42,000.[4]

- On Count III (Injury to Land – 14 M.R.S. § 7552) of the Amended Complaint, Plaintiff is awarded $20,000 against both Defendants jointly and severally. Pursuant to 14 M.R.S. § 7552, Plaintiff is also awarded the attorney fees and costs attributable to this claim, also jointly and severally.

- On Count IV (Trespass – 14 M.R.S. § 7551-B), judgment shall be entered for Defendants.

- On Count VI (Defendants regarding building of the "Spur Road" – Trespass), judgment shall be entered for Defendants.

On Defendant Emera's cross-claim, the court awards judgment for Emera against Hawkeye for $42,000 and the attorney fees and costs awarded to Plaintiff on Count III.

Lastly, given that Plaintiff prevailed on two elements of his damage claims and the Defendants prevailed on the others, no party can be deemed to have substantially prevailed in the case as a whole, except that Emera did prevail on its cross-claim.

Accordingly, it is hereby ORDERED AND ADJUDGED AS FOLLOWS:

1. Plaintiff Jay McLaughlin is awarded judgment against Defendants Emera Maine and Hawkeye, LLC jointly and severally in the total amount of $42,000.

2. Plaintiff is awarded his reasonable attorney fees and costs attributable to the claim under 14 M.R.S. § 7551-B in Count IV of the Amended Complaint.

3. Plaintiff is awarded pre-judgment and post-judgment interest on the judgment.

4. Defendant Emera Maine is awarded judgment on its cross-claim against Defendant Hawkeye, LLC for the damages, attorney fees, costs and interest awarded to Plaintiff, and for Emera Maine's reasonable attorney fees and costs incurred in the defense of Plaintiff's claims and in the prosecution of Emera's cross-claim.

---

[4] Due to the existence of the contractual obligations defined in the License Agreement, Emera is not liable for negligence with respect to the $20,000 in damages relating to filled-in ditching on Taylor Road.

31

5. Except for costs awarded on Count IV, Plaintiff is not awarded costs against Defendants.

6. Hawkeye is not awarded its costs against Plaintiff or Emera Maine.

7. Emera Maine is not awarded costs against Plaintiff and is awarded costs on the cross-claim against Hawkeye.

8. Plaintiff and Emera Maine shall submit affidavits and supporting material regarding attorney's fees and costs within 14 days.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Decision by reference in the docket.

Dated 16 September 2016 

\_\_\_\_/s_____
A. M. Horton
Justice, Business and Consumer Court

**Jay McLaughlin**

**v.**

**EMERA MAINE, f/k/a Bangor**

**Hydro-Electric Company,**

**and HAWKEYE, LLC**

**BCD-CV-2015-14**

**Plaintiff:**

Jay McLaughlin

N. Laurence Willey, Jr.
Willey Law Offices
PO Box 924
Bangor ME  04402-0924

**Defendants:**

EMERA MAINE, f/k/a

Bangor Hydro-Electric

Company,

and

HAWKEYE, LLC

William Devoe, Esq
Eaton Peabody
PO Box 1210
Portland ME  04402-1210

Jeffrey T. Edwards, Esq.
Preti Flaherty
PO Box 9546
Portland ME  04112-9546

STATE OF MAINE                          BUSINESS AND CONSUMER COURT

Cumberland, ss.


**JAY McLAUGHLIN,**

              Plaintiff

       v.                                   Docket No. BCD-CV-15-14 ✔

**EMERA MAINE,** f/k/a Bangor Hydro-Electric Company,
and **HAWKEYE, LLC**

              Defendants

### ORDER ON PLAINTIFF'S CLAIM FOR ATTORNEY FEES AND COSTS

The application for attorney fees and costs of Plaintiff Jay McLaughlin is before the court, together with the opposition of Defendant/Cross-Claim Hawkeye, LLC [Hawkeye] and Plaintiff's reply. Plaintiff's reply was filed very late and it is the subject of a motion to strike by Hawkeye. Because the reply memorandum was over a month late, the motion to strike will be granted. The court elects to dispense with oral argument in light of the thoroughness of briefing. *See* M.R. Civ. P. 7(b)(7).

Plaintiff's claim arises under 14 M.R.S. § 7552(5), which permits the recovery of "the reasonable costs of professional services necessary for determining damages and proving the claim as long as the person first has written notice or actual knowledge that a claim is being asserted." *Id.*

Plaintiff has submitted a bill of costs as well as attorney fee affidavits, reflecting fees and costs for services rendered by Plaintiff's attorneys and by the consultants and experts for Plaintiff. Plaintiff's incurred attorney fees are as follows: $282,029.21 for services and costs rendered in this case by Willey Law Offices, and $91,346.85 for services by Joseph L. Ferris, Esq., P.A. and Gross, Minsky & Mogul, P.A. Attorney Ferris transitioned from his sole

1

practice to the Gross Minsky firm during the pendency of the case, so his services were rendered in the name of both firms at different times. In addition, Plaintiff's bill of costs seeks reimbursement for the cost of services of Norman Turner in the amount of $212,438.91, and for the cost of services rendered by Calvin Hafford and Stephen Howell. The total amount of professional fees and costs incurred by Plaintiff is in excess of $600,000.

Hawkeye raises multiple objections to the claim, some of which have already been addressed, and need not be revisited in detail. Hawkeye's opposition also asks the court to reconsider its prior ruling to the effect that Plaintiff is entitled to recover attorney fees under section 7552. The court declines to do so, for the following reasons:

- Hawkeye notes that section 7752 applies only to trees damaged without the owner's permission, and contends that the evidence showed that Plaintiff permitted Hawkeye to damage the trees at issue. That is not a finding that the court has made. The fact that Hawkeye tendered Plaintiff a check for damaged trees belies Hawkeye's position.

- Hawkeye's tender of the $1,433.18 check did not trigger the offer of settlement provisions of section 7552(6) for at least two reasons. First, by statute, Plaintiff is entitled to double damages at a minimum, so to trigger subsection 7552(6), Hawkeye's offer had to be twice what Hawkeye tendered. Also, the evidence did not indicate whether Hawkeye at the time it provided the check also provided Plaintiff with Mr. Kolenik's analysis and other "liability and damage information" available to Hawkeye and "necessary or pertinent to an evaluation" of the Plaintiff's claim. *See id.* § 7552(6).

In sum, for these and the further reasons set forth in the Amended Decision, Hawkeye has not persuaded the court that Plaintiff's attorney fee claim under section 7552 is barred.

Accordingly, the analysis turns to the claim.

2

As a threshold matter, it should be noted that the statute covers the "costs of professional services", which may in appropriate cases include, not only attorney fees, but also the costs of other professionals such as surveyors and foresters. Here, the court's award of damages for loss of trees was based on the analysis done by Hawkeye's witness, John Kolenik of the Prentiss & Carlisle forest resource management firm. Accordingly, to the extent Plaintiff seeks reimbursement for his expert witness expenses, it is denied. The court did rely on the testimony of Norman Turner, Plaintiff's road damage expert, but not for issues relating to the Plaintiff's section 7552 claim, which is the only claim on which he entitled to an award of professional fees.

Accordingly, the focus is on Plaintiff's attorney fee request, and not on any other professional fees.

*Applicable Law*

In making an award of attorney fees, the court is to consider a range of factors:

(1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorneys due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Poussard v. Commercial Credit Plan, Inc.*, 479 A.2d 881, 885 (Me. 1984).

Of the foregoing factors, the court considers most important the factors numbered (1) and (8). This case involved a plethora of claims and issues, but the legal issues were not particularly novel or difficult. The time spent and the hourly rates involved on the part of Plaintiff's counsel are reasonable. However, as the Law Court noted in *Poussard*, "[t]he product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead . . . [a] court to adjust the fee upward or downward,

3

including the important factor of the 'results obtained'. 479 A.2d at 885, *quoting Hensley v. Eckerhart*, 461 U.S. 424, 103 S. Ct. 1933, 1940 (1983).

The time and labor involved, the amount at issue and results obtained, all have to be evaluated solely in terms of the section 7552 claim, because it is the only claim as to which the Plaintiff is entitled to an award of attorney and other professional fees, although it was only one of many claims pressed by Plaintiff in the case. In fact, most of the Plaintiff's effort at trial was focused on other aspects of the case, primarily Plaintiff's claims regarding damage to the roads on his property and his claims regarding road material shifted (or "spewed", to use the term applied at trial) into the woods on either side of the roads. No attorney fees are recoverable for these aspects of the case.

Based on the entire record, the court awards the Plaintiff $20,000 in attorney fees and $2,000 in costs on his section 7552 claim. This is much more than the amount Plaintiff recovered on the claim, but the amount recovered does not set a cap on attorney fees. In *Poussard*, for example, the attorney fee award was $20,000, based on a judgment for $1,000 (although the Law Court noted that the plaintiffs' total recovery amounted to $10,000, considering that the judgment relieved them of various loan obligations). As the Law Court noted, "Given the complexity of the case and the other factors found by the court, the ratio between recovery and fees is not so disproportionate as to compel the rejection of the number of hours expended as the basis for the fee." 479 A.2d at 886. Such is the case here. The fact that Hawkeye and Emera chose to litigate every aspect of Plaintiff's claims, and thereby drove up the costs of litigation for themselves and Plaintiff, should not count against Plaintiff. On the other hand, Hawkeye and Emera did prevail on many aspects of the case. As noted in the Final Judgment that accompanies this Order, the fact that Plaintiff prevailed on some aspects and the

4

Defendants on others, leads the court to find and conclude that, except for the award to Plaintiff on his section 7552 claim, the parties should bear their own costs.

IT IS ORDERED:

1. Plaintiff's application for professional fees and costs on his claim in Count III (14 M.R.S. § 7552) is granted in part, to the extent of this Order, and is otherwise denied.

2. Plaintiff is awarded a total of $20,000 in attorney fees and $2,000 in costs on Count III pursuant to 14 M.R.S. § 7552(5).

3. Hawkeye's Motion to Strike Plaintiff's reply memorandum is granted.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated February 17, 2017

A. M. Horton, Justice

5

Jay McLaughlin v. Emera Maine, f/k/a Bangor Hydro-Electric Company, and Hawkeye, LLC

## BCD-CV-2015-14

Jay McLaughlin

### Plaintiff

Counsel:  *Joseph Ferris, Esq.*
23 Water St. Suite 400
Bangor, ME 04402

Emera Maine

### Defendant

Counsel:  *William Devoe, Esq.*
80 Exchange St.
Bangor, ME 04402-1210

Hawkey, LLC

Counsel:  *Jeffrey Edwards, Esq.*
One City Center
Portland, ME 04112-9546

STATE OF MAINE

BUSINESS AND CONSUMER COURT

Cumberland, ss.

JAY McLAUGHLIN,

Plaintiff

v.

Docket No. BCD-CV-15-14

EMERA MAINE, f/k/a Bangor Hydro-Electric Company,
and HAWKEYE, LLC

Defendants

## AMENDED DECISION

This case involves an action by Jay McLaughlin ["Plaintiff" or "Mr. McLaughlin"], the owner of a large woodlot in Greenbush, Penobscot County, Maine, against Emera Maine ["Emera"], an electric utility company, and Hawkeye, LLC ["Hawkeye"], Emera's construction contractor, for damages arising out of injury and loss to roads, land, trees and vegetation on Plaintiff's property.

Plaintiff McLaughlin's Amended Complaint asserts six counts against both Defendants, except where indicated: Count I (Breach of Contract, License Agreement) against Emera only; Count II (Negligence); Count III (Injury to Land -- 14 M.R.S.A. §7552); Count IV (Trespass -- 14 M.R.S.A. §7551-B); Count V (Promissory Estoppel -Breach of Contract), and Count VI (Defendants regarding building of the "Spur Road" –Trespass).

Both Defendants answered, denying liability and asserted affirmative defenses. In addition, Emera Maine filed a cross-claim against Hawkeye, asking that Hawkeye indemnify Emera against any damages assessed against Emera and for Emera's attorney's fees and costs incurred in the defense of this action.

1

As a result of Defendants' motions for summary judgment, Hawkeye was granted summary judgment on the breach of contract claim in Count I of the Amended Complaint, and both Defendants were granted summary judgment on the promissory estoppel claim in Count V. The remaining counts went to trial.

The case was tried to the court over the course of nine days in April 2016, with part of one trial day dedicated to a view of the property. The parties together submitted hundreds of exhibits in binders occupying a half dozen file boxes, most of which were admitted into evidence. After the trial, the parties submitted a total of 184 pages of proposed findings of fact and conclusions of law and responses to each other's post-trial filings. The last filing is dated June 17, 2016, at which point the court took the case under advisement.

The court's Decision dated September 16, 2016 prompted motions for further findings of fact and conclusions of law pursuant to M.R. Civ. P. 52(b) from Plaintiff McLaughlin and Defendant Hawkeye, and also a motion to amend judgment from Hawkeye pursuant to M.R. Civ. P. 59(e). The court's orders on those motions are issued herewith.

This Amended Decision differs from the initial Decision in several ways. First, it corrects a statement in the Decision to the effect that the Plaintiff accepted payment of $1,433.18 for damage to trees. In fact, he rejected the payment. Because the court finds he is entitled to damages in that amount, this Amended Decision adds that amount to the award to Plaintiff, and corrects the references to the $1,433.18 tender of payment at various other places.

Second, this Amended Decision awards the Plaintiff double damages on Count III for damage caused negligently or without fault, pursuant to 14 M.R.S. § 7552(4)(A), as well as his attorney fees and costs associated with this claim.

Third, this Amended Decision grants judgment to the Defendants on Count IV, which asserts a claim under 14 M.R.S. § 7551-B, because that statute imposes liability only on persons

2

who enter property without permission, whereas BHE and Hawkeye both had Plaintiff's permission to enter his property—in writing through the License Agreement and orally with respect to the so-called spur road.

Next, this Amended Decision clarifies a point of evidence omitted from the original Decision—that Gil Paquette, the environmental compliance manager retained by Bangor Hydro-Election to monitor Hawkeye's performance on the job initially called for Hawkeye to put gravel on the section of road ("the approach road") leading from the public highway to Plaintiff's property, and then decided that the gravel was not needed.

Based on the entire record, the court hereby adopts the following findings of fact and conclusions of law and renders judgment on the Amended Complaint and Emera's Cross-claim as set forth below. Unless otherwise stated, all findings are made based on a preponderance of the evidence.

### Background of the Parties and the Property

1. Plaintiff Jay McLaughlin is the owner of a 3,200-acre parcel of mixed forest land located in Greenbush, Maine ("the Property" ). Mr. McLaughlin also owns and operates a commercial logging company as well as a commercial mill.

2. Defendant Emera is the owner of a transmission line, known as Line 64, located in a corridor running through the Property. Defendant Hawkeye is a utility construction company engaged by Emera to rebuild the Line 64 transmission line.

3. The Property was purchased by Mr. McLaughlin from the Greenbush Timber Company on December 31, 1997 for $490,000.00. At the time of the purchase, a number of established unpaved wood roads were used to access the Property in conjunction with forest harvesting operations. One of these, the Taylor Road, runs most of the length of the Property and has been the main means of vehicle access over the property.

3

4. Access to the Property from the nearest public road is over a 1,400-foot approach road owned by the Town of Greenbush. It runs from the public road and connects with the Taylor Road at Mr. McLaughlin's northern property boundary. Mr. McLaughlin has a deeded easement to use the Town's approach road to go between the Property and the public road.

5. After purchasing the Property in 1997, Mr. McLaughlin made a number of improvements, including rebuilding Taylor Road, using proper materials, ditches and crowning.

6. Mr. McLaughlin also engaged in extensive harvesting of wood on the Property. According to Chris Stevens, Plaintiff's forestry expert, Plaintiff harvested wood on about half of the acreage on the Property between 2001 and 2009, leaving timber still standing on the Property with an approximate market value of $626,000 as of 2009. Aerial photographs of the Property indicate forestry harvesting operations had taken place to varying degrees throughout the Property, leaving a network of skidder trails. Defendant Hawkeye Exhibits 66, 67 and 69.

7. Before any of the events giving rise to this dispute, the past logging activities conducted by the Plaintiff on the Property involved environmental violations that resulted in the imposition of fines and penalties by the Maine Department of Environmental Protection. (Defendant Hawkeye Exhibits 5, 6, 7 and 8). However, none of the environmental violations that apparently occurred during the Plaintiff's logging activity prior to 2011 has any material bearing on the issues presented, so they are not considered further.

8. The main means of access across the Property, Taylor Road, was a seasonal dirt and gravel road capable of supporting heavy equipment only during summer months and winter months. Taylor Road was unusable by trucks and other heavy vehicles during spring mud season and the fall rainy season.

4

9. As of 2011, the road had not been compacted through five freeze/thaw cycles. As a result of the lack of compaction, the passage of vehicles had begun to displace the road material toward the center and to erode the shoulder of the road in places. There were depressions that resulted in puddling during rainy periods and spring thaw. In other words, the Taylor Road was in reasonably good condition, but not excellent condition, as of the beginning of 2011.

*The Line 64 Rebuild Project and the SOCA*

10. At the time of the events described herein, Emera Maine was known as Bangor Hydro-Electric Company (BHE). Sometime before February 2010, BHE decided to undertake an upgrade to its electrical service by rebuilding the Line 64 transmission line. The project became known as "the Line 64 Rebuild Project."

11. The project consisted of the rebuilding of the existing transmission line for a distance of 44 miles from Veazie to Chester and included the installation of more than` 300 new towers as well as associated conductors and hardware.

12. BHE's principal contractor for the Line 64 Rebuild Project was Hawkeye. On or about February 12, 2010, Hawkeye and BHE entered into a Supplier of Choice Agreement ("SOCA") delineating the terms and conditions of the work to be performed by Hawkeye in connection with the Line 64 Rebuild Project. Defendant Emera Maine's Exhibit 32.

13. The SOCA between BHE and Hawkeye stated, among other things, that "[Hawkeye] agrees to adhere to and comply with [BHE's] Environmental Guideline for Construction and Maintenance Activities on Transmission Line and Substation projects . . . adhere to and comply with the Environmental Specifications for Line 64 Rebuild . . . [and] be responsible for ensuring all employees, sub-suppliers, agents and representatives of [Hawkeye] comply with all federal, state and local health, safety and environmental statutes, regulations,

5

policies, guidelines and all health, safety and environmental rules as prescribed by [BHE]." Defendant Emera Maine's Exhibit 32 at 6.

14. By virtue of entering in the SOCA with BHE, Hawkeye committed itself to following specific standards and requirements in a variety of areas, including safety and environmental protection, and to "promptly correct defective deficiencies in products and services" in the course of its work on the Line 64 Rebuild Project.

15. The SOCA also required Hawkeye to use approved access roads in order to move equipment and materials to the transmission line where the work was to be performed.

16. The SOCA contained an indemnity clause pursuant to which Hawkeye agreed to indemnify BHE "from and against any liabilities, losses, expenses (including reasonable attorneys' fees), claims, demands, actions, and causes of action, whatsoever arising out of, or in any way attributable to, the operation of [the SOCA] or ancillary to [Hawkeye's] negligent provision of the Products and/or Services contemplated herein." *Id.* at 9.

17. The SOCA further provided that "[t]he provisions set forth in this [indemnity] Clause shall apply and be effective with respect to any claim, cause of action, or legal theory whatsoever including without limitation, claims based upon breach of contract, breach of warranty, failure to meet performance guarantees, tort (including negligence) and strict liability." *Id.*

18. BHE retained an environmental consulting firm, TRC Environmental, to oversee and monitor Hawkeye's work on the Line 64 Rebuild Project, especially in connection with environmental and land use issues such as erosion protection and protection of trees, wetlands, streams and other natural resources. The terms of TRC's engagement are set forth in a Master Consulting Services Agreement between BHE and TRC Environmental.

6

*The Transmission Line Access License Agreement*

19. In preparation for the Line 64 Rebuild Project, BHE approached the owners of the land over which Line 64 crosses to seek the owners' permission to gain access to the transmission line and perform the reconstruction.

20. On or about July 29, 2010, Plaintiff Jay McLaughlin and BHE entered into a certain Transmission Line Access License Agreement ("License Agreement"), granting BHE and its contractors access over portions of the Property for purposes of the Line 64 Rebuild Project, in exchange for payment of $31,600 to Mr. McLaughlin. See Plaintiff's Exhibit 8.1.12. The License Agreement consists of the one-page written agreement and an attached aerial photograph of the Property labeled as Exhibit A.

21. The parties agree that the purpose of the License Agreement was to allow access by BHE, its employees, agents, and contractors, to an electrical transmission line utility corridor that crosses a portion of Mr. McLaughlin's property, with men and equipment, for purposes of the Line 64 Rebuild Project.

22. The License Agreement did not contain any seasonal restrictions on the rights of use and access it conferred on BHE and its contractors, and did not prohibit the use of the Property in March, April, May or June of 2011.

23. The License Agreement between BHE and Mr. McLaughlin stated, among other things, that "Landowner is willing to allow Bangor Hydro to enter the Property for the purpose of accessing the Transmission Line." The License Agreement, however, does not say that BHE and its contractors may go anywhere on "the Property"; instead, it limits BHE's and its contractors' rights to what the License Agreement refers to as "the Strip."

24. The License Agreement says that BHE, its employees, agents, and contractors, may "perform the following activities in the location on the Property generally depicted on Exhibit

7

'A' (the '*Strip*'), attached hereto and made a part hereof. The right to enter upon the Strip with workers and equipment and all necessary tools for the purpose of accessing the Transmission Line; and the right to improve and maintain roads over the Strip to facilitate access to the Transmission Line, including the right to install culverts with the consent of the Landowner." *Id.*

25. Because of an ambiguity in the License Agreement, the parties disagree on exactly what area is encompassed within what the License Agreement calls the "Strip" and also disagree on what rights of access over Plaintiff's property the License Agreement conferred on Emera and its contractors, including Hawkeye.

26. What makes the License Agreement ambiguous is that neither the one-page writing nor the attached aerial photograph designates any specific area of the Property as "the Strip." Exhibit A depicts roads on the Property in yellow and labels them as access roads. The yellow access roads on Exhibit A are identified as AR-21 and ARG-02, and they intersect the Line 64 transmission corridor at two points toward the southerly end of the Property.

27. The Taylor Road historically provided three points of access to the Transmission Line right of way—the two that are shown on Exhibit A and a third one north of those two. Prior to the Line 64 Rebuild Project, this northerly means of access was via what is referred to in record as the "spur road"—an unimproved woods road, little more than a skidder trail. The spur road appears to be faintly visible on Exhibit A—where the Taylor Road makes a fairly sharp (50°-60°) turn to the right on its way south, the spur continues straight ahead in a southeasterly direction toward the Line 64 transmission line corridor.

28. The License Agreement does not label the "spur road" as an access road. It does label the roads intersecting the transmission corridor in two places to the south as access roads— AR-21 Taylor Road and ARG-02 Madden Meadows Road North. Moreover, the very

8

title of the License Agreement includes a reference to the roads designated as AR-21 & ARG-02, thereby supporting the view that the License Agreement provides access over those two roads.

29. Defendants argue that everything depicted on the exhibit attached to the License Agreement was the "Strip" and therefore BHE and its contractors could enter and pass over Plaintiff's entire property. However, the License Agreement describes "the Strip" as being "a location on the Property," so "the Strip" cannot refer to the entire Property. Plaintiff argues that the "Strip" was limited to access roads as labeled on the exhibit to the License Agreement, and did not encompass the so-called "spur" road off the Taylor Road or any other part of the Property.

30. Because the License Agreement and Exhibit A were both drafted by BHE or on its behalf, the ambiguity must be construed in favor of Plaintiff McLaughlin and against BHE. When contract language is ambiguous, it must be interpreted according to its plain and commonly accepted meaning. *Flaherty v. Muther*, 2013 ME 39, ¶ 17, 65 A.3d 1209; *Cookson v. Liberty Mut. Fire Ins. Co.*, 2012 ME 7, ¶ 8, 34 A.3d 1156.

31. The court finds and concludes that the License Agreement did not grant BHE or its contractors the right to access the transmission line corridor from Taylor Road via the Taylor 1 spur road. Based on the entire record, the court construes the License Agreement to grant BHE and its contractors access over roads labeled "ACCESS ROAD" on the exhibit, not to grant BHE or its contractors access over the spur road.

32. However, during Hawkeye's work on the Property, Mr. McLaughlin gave oral permission for BHE and Hawkeye to use the spur to gain access to the transmission corridor. Based on this permission, Hawkeye used the Taylor 1 spur road extensively to access the Line

9

64 project, and made extensive changes to the spur road, widening and grading it, and essentially converting it from a skidder trail to a gravel road suitable for heavy equipment.

33. After Hawkeye had finished its work on the Property and moved on, Mr. McLaughlin met with representatives of BHE and Hawkeye and asked for some restoration work to be done on the spur road. Hawkeye arranged for a local road contractor, Sunset Development, to put gravel on the spur road to make it more suitable for Plaintiff's wood harvested operations.

*Hawkeye's Work on the Property*

34. In November 2010, before Hawkeye had begun accessing the Property for purposes of the Line 64 Rebuild Project, BHE and its consultant, TRC, went there for the purpose of documenting the condition of the designated access roads as well as the spur, and marking their location. TRC took a number of photographs that show stretches of the Taylor Road not being in good condition throughout, likely as a result of not having been compacted during the previous five cycles of freezing and thawing. See Plaintiff's Exhibit 10.9.6.

35. Taken as a whole, the photographic evidence and testimony indicate that there were crowns and ditches and other features of a well-maintained, functional road in some places, but not in others. The condition of the Taylor Road was somewhere between the poorly maintained condition that Emera and Hawkeye ascribe to it and the excellent condition that Plaintiff ascribes to it.

36. Pursuant to the License Agreement, BHE's contractor, Hawkeye, commenced its construction activities by using Taylor Road and other roads on Plaintiff's property for access to Line 64. *See* Plaintiff's Exhibit 4, ¶27.1.3. Hawkeye began operations on the Property in March 2011 and used the Property to access Line 64 for the next six or seven weeks.

10

37. Before Hawkeye began to send truck and other heavy vehicles over the roadways on the Property, Hawkeye installed erosion controls at strategic locations along the Taylor Road. These controls included timber mats, silt fencing, hay bale check dams, seeding and mulching. Josh Teel of Hawkeye and Gil Paquette and Paul Corey of TRC monitored, maintained, and enhanced the erosion controls throughout the period of time that the Taylor Road was used by Hawkeye. The controls were frequently inspected and upgraded, especially after rain events, to assure that they were continuing to function as controls over the unreasonable discharge of sediment into protected natural resources.

38. Although Plaintiff's expert, Norman Turner, documented problems with the erosion controls installed by Hawkeye, his initial observations did not come until June 2011, several months after Hawkeye's last activity on the Property. His observations regarding the deteriorated state of some of Hawkeye's erosion control installations do not necessarily reflect anything other than the passage of time. On the other hand, Mr. Turner's testimony and photographs did establish that some of Hawkeye's erosion control measures failed to control the movement of earth material and water from the roadway into the woods.

39. There is no doubt that Hawkeye's vehicles and equipment did considerable damage to the Taylor Road during the six or seven weeks during the late winter/early spring that Hawkeye was using the road. The road was thawing, if not thawed, and was already soft due to the lack of compaction over the prior several years. How many vehicle trips were made over the Taylor Road is not indicated in the evidentiary record, but it must have been in the hundreds, if not thousands, of trips. The vehicles ranged in size from pickup trucks to multi-ton heavy trucks and trailers.

11

40. One of Hawkeye's practices that was particularly destructive to the road surface was the dragging of heavy wooden pallets, known as "mats," along Taylor Road to the transmission line. Each mat was 16 feet by 4 feet and weighed about 1,500 pounds.

41. A former equipment operator for Hawkeye, Gordon Boyington, testified that mats would be stacked high and dragged along the muddy road, moving large quantities of material off the crown and middle of the road onto the shoulder and into the surrounding forest.

42. The purpose of mats is to provide additional support for vehicles and equipment, and also to protect sensitive areas, such as wetlands and streams. BHE's Environmental Guidelines for Construction and Maintenance Activities on Transmission Line and Substation Projects includes a section on the use of mats:

> "BHE construction projects require that adequate mats are present at the project site prior to construction. A readily accessible source of mats should also be available in case construction conditions change and necessitate the need for more mats." Plaintiff's Exhibit 1 at 10, ¶4.3.

43. The same document contains a specific warning against dragging mats as opposed to transporting them: "Whenever possible, mats should be carried and not dragged. Dragging mats creates more soil disturbance which requires additional erosion control or final restoration work." Plaintiff's Exhibit 1 at 11. Hawkeye asserts that this reference discourages dragging of mats only in environmentally sensitive areas, but the specifications do not contain that limitation. Even if, as Hawkeye points out, the specifications did not prohibit the dragging of mats except in environmentally sensitive areas, the evidence plainly showed that Hawkeye's practice of dragging mats along the Taylor Road did substantial damage to the road, mainly by moving material to the sides, into ditches, and even entirely off the roadway.

44. Hawkeye's bid on the Line 64 Rebuild Project included far fewer mats than competing bids for the job. Hawkeye's bid included slightly over $2 million for mats, whereas competing bids from PAR Electric and 3 Phase Electrical Contractors had been between $17

12

million and $33 million. See Plaintiff's Exhibit 10.5.1.c.7 and 10.5.1.c.7.a. Hawkeye's $2 million would purchase between 5,000 to 7,000 mats at a price of $285 to $400 per mat. BHE was supposed to provide an additional 3,000 mats, but due to a supply problem only provided a fraction of that amount. See Plaintiff's Exhibit 10.5.1.c.9. The BHE/Hawkeye/TRC weekly meeting minutes and the TRC monthly initiative status reports made reference to a shortage of mats. Plaintiff's Exhibit 10.5.1.c.11 and 10.5.1.c.12.

45. Hawkeye evidently did place mats in selected locations on the Taylor Road as well as on the transmission line, but the Taylor Road was never completely covered with road mats during construction. Had it been, the damage to the road would have been lessened. However, nothing in any of the extensive exhibits on record specifically requires mats to be installed on the entire length of access roads.

46. Another practice that displaced material from the road was Hawkeye's practice of using bulldozers to scrape loose, muddy material off the surface so as to create a hard travel surface. Hawkeye's equipment moved the loose material to the roadsides, similar to how plows move snow onto the side of a road. Mr. Boyington testified to how his and other bulldozers moved—the Plaintiff's preferred term is "spewed"—quantities of gravel, mud and other material from the road onto the shoulders of the road, into ditched areas and even a short distance into the surrounding woods.

47. Plaintiff's evidence established persuasively that Hawkeye's operations did displace material from the road onto the shoulders and into ditches, where ditches existed. On the other hand, although the Plaintiff contends that material from the road was deposited far into the woods throughout the length of Taylor Road, neither the evidence nor logic bears out that contention. There are woods on either side of the road for almost its entire distance—material flung outward from the road could not travel very far before hitting trees and branches and

13

dropping. Also, the court's view of the property did not indicate that trees on either side of the Taylor Road were dead or dying or seemingly at risk of dying, as the expert evidence indicated would be the case if their root systems had been smothered under large quantities of sediment, mud or other material. In some locations along Taylor Road, however, muddy material moved long distances into the woods, not because it was flung there, but because it was carried there with the flow of water off the road.

48. Hawkeye regularly took steps to repair the damage to the road caused by the passage of vehicles and mats and by the scraping of mud to the side. On a virtually daily basis, Hawkeye had bulldozers or backhoes "backdragging" the rutted and damaged sections of Taylor Road. Backdragging involves dragging the bucket backward, thereby bringing loose material back into ruts and leveling the surface of the road. Backdragging helped smooth ruts and enabled material that had been pushed to the sides of the road to be brought back toward the middle.

*Hawkeye's Remediation Work*

49. In addition to installing and maintaining erosion control measures and performing periodic repair of damage to the Taylor Road during its work on the Property, Hawkeye retained a local road contractor, Sunset Development, to do further repair and restoration work on the Taylor Road.

50. Over a six-week period, Sunset Development did the following to repair and restore the Taylor Road: installed an additional 3,000 cubic yards of screened gravel at various locations along the Taylor Road, covering a mile of road; raked, graded, and compacted the Taylor Road; restored the crown to the Taylor Road; recreated ditches along stretches of the Taylor Road; removed the erosion controls that had been installed by Hawkeye; removed

14

material from alongside of the road, and installed nine culverts in order to restore the drainage system to the road. Sunset Development was paid a total of $55,100 for this work.

51. In November 2011, there was a meeting attended by Jay McLaughlin to discuss the remedial measures that needed to be completed in order to address Mr. McLaughlin's concerns. As a result of that meeting, Gil Paquette, the environmental compliance manager for BHE, developed a punch list to Hawkeye.

52. The punch list called for additional gravel on the Taylor 1 spur road, in order to upgrade and improve that road. Hawkeye asked Sunset Development to do that work, which resulted in an additional payment of $5,000 to Sunset Development.

53. Mr. McLaughlin had numerous conversations with Mr. Paquette and Mr. Quigley about damage to trees and plants along the Taylor Road and about the deposit of material from the road into the surrounding woods. During one of those conversations, Mr. Quigley indicated that Hawkeye would consider clearing material out of the woods using a vacuuming system. However, Hawkeye did not follow through on that idea.

54. Mr. Quigley and Mr. McLaughlin did a damage assessment of the trees and vegetation along Taylor Road and came up with a total of 4,448 items. However, Hawkeye later retained John Kolenik, a licensed professional forester with Prentice & Carlisle of Bangor, Maine, to do an evaluation of damage to trees and plants along Taylor Road. Mr. Kolenik made an inspection of tree damage along the Taylor Road and determined that the forfeiture value of trees that were damaged, using the timber trespass statute, was $1433.18, and that the market value of the roadside trees damaged by Hawkeye's operations was minimal.

*Plaintiff's Theories of Liability*

55. This section addresses the legal grounds on which the Plaintiff seeks to recover damages from the Defendants. As noted above, the claims of Plaintiff that went to trial were as

15

follows: Count I—Breach of Contract (Emera only); Count II—Negligence; Count III—Injury to Land and Forest Products (14 M.R.S. §7552); Count IV—Trespass to Land (14 M.R.S. §7551-B), and Count VI—Trespass concerning the "spur road." Plaintiff has the burden of persuasion on all of its claims, as to both liability and damages. Defendants deny liability and dispute damages on all of the Plaintiff's claims.

56. The contract applicable to Count I is the Transmission Line Access Licensing Agreement between BHE and Mr. McLaughlin. Other than the ambiguity relating to "the Strip," the provision most relevant to this case appears at paragraph 4: "Bangor Hydro shall repair, or cause to be repaired, any damage to the Property caused by Bangor Hydro beyond normal wear and tear." The phrase "beyond normal wear and tear" is admittedly somewhat ambiguous. However, the conduct of the parties during and after the Line 64 Rebuild Project resolves the ambiguity. The evidence is clear that Hawkeye (with the support and concurrence of BHE) undertook to restore the McLaughlin Property to what was substantially its condition before Hawkeye's work, and to compensate Mr. McLaughlin for what could not be restored (such as damaged or destroyed trees).

57. As an example, the TRC environmental compliance manager, Gil Paquette, who was acting on behalf of BHE, prepared a "punch list" after a meeting and inspection of the property with Mr. McLaughlin in November 2011, after Hawkeye had left the property. The "punch list" indicates that BHE and Hawkeye understood that their obligation was to repair and restore to its condition (apart from "normal wear and tear") before Hawkeye's work began, and to compensate the Plaintiff for what could not be repaired and restored. Accordingly, the court will evaluate Plaintiff's breach of contract claim against Emera using that template for determining breach and damages.

58. Count II of the Amended Complaint asserts a claim against Defendants for negligence. A claim for negligence may prevail where a plaintiff proves that the defendants

16

owed plaintiff a duty, the duty was breached, and that plaintiff was injured. *Grant v. Foster Wheeler, LLC,* 2016 ME 85, ¶ 14. Where the duty asserted by a plaintiff derives from a contract, there must be an extra-contractual duty in order for Plaintiff to succeed on a claim for negligence.[1]

59. Plaintiff claims that the license provided by the License Agreement is analogous to an easement and, like an easement, imposes a duty upon the license holder to reasonably use the property. In a license agreement, the rights and obligations of the parties are limited to those rights and obligations described in the agreement. "In interpreting [a license] contract the ordinary rules of construction apply. The primary purpose is to determine 'what intention or purpose is expressed by the words and phrases used. It is that meaning by which the parties are bound, even though one or the other honestly believed the language to have a different meaning.'" *4-One Box Machine Makers v. Wirebounds Patents Co.,* 131 Me. 356, 163 A. 167 (Me. 1932) (citations omitted). There is no legal support for the contention that the granting of a license automatically creates a non-contractual duty.

60. Plaintiff further argues that he is owed a duty of care by Defendants, akin to a fiduciary duty, as a result of the "special relationship" between him and Emera and/or Hawkeye. Plaintiff alleges that the special relationships arise from contract requiring Defendants to protect Plaintiff from damage. "Special relationships for purposes of a negligence claim are grounded in the notion that a person or entity owed the plaintiff a fiduciary duty. A fiduciary duty will be found to exist where the law will recognize both the disparate positions of the

---

[1] "There are situations where the breach of a contractual duty may also give rise to a tort action: But in such cases, the injury to the plaintiff has been 'an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted benefit.' . . . 'In order to maintain an action ex delicto because of a breach of duty [arising] . . . out of a contractual relation, the breach must be shown to have been a breach of a duty imposed by law and not merely . . . [the same duty] imposed by the contact.'" *L. L. Bean Inc. v. Metro-Autospan, Inc.,* No. CV-88-1362, 1989 Me. Super. LEXIS 250, *13-14 (Dec. 11, 1989) (citing *Long v. Jim Letts Oldsmobile, Inc.,* 135 Ga. App. 293, 217 S.E.2d 602, 604 (Ga.Ct.App.1975)).

17

parties and a reasonable basis for the placement of trust and confidence in the superior party in the context of specific events at issue." *DeCambra v. Carson*, 2008 ME 127, 953 A.2d 1163 (Me. 2008). In this case, Plaintiff has not proven the existence of a special relationship between him and either of the Defendants.

61. However, the negligence claim in Count II is likely the only claim under which the Plaintiff can seek to hold the Defendants liable for altering the 1400-foot approach road to his property owned by the Town of Greenbush. The License Agreement does not cover the approach road because it is not Plaintiff's property. For the same reason, the Defendants cannot be held liable on a theory of trespass, either at common law or by statute, to the Plaintiff. On the other hand, Plaintiff's claim regarding the approach road—that the Defendants left the approach road unusable by Plaintiff's heavy trucks and equipment—is cognizable on a negligence theory. The Defendants owed Plaintiff a duty to use reasonable care not to cut off Plaintiff's access to his own property by rendering the approach road impassable by his vehicles. Defendants plainly knew or should have known that the Plaintiff's logging operations employ heavy trucks and equipment, and that the approach road constituted Plaintiff's primary means of access to his property. Thus, the negligence claim is the sole basis in the Amended Complaint on which the Defendants can be held liable to Plaintiff with regard to the approach road.

62. The negligence claim in Count II also applies to Hawkeye's work on the Property, given that there is no contract defining Hawkeye's duties to Plaintiff. The law imposes a duty of care to avoid causing physical injury or damage to another person or another person's property.

63. Count III of the Amended Complaint asserts Plaintiff a claim under 14 M.R.S. § 7552, which prohibits "[c]ut[ting] down, destroy[ing], damage[ing] or carry[ing] away any forest product, ornamental or fruit tree, agricultural product, stones, gravel, ore, goods or property of any kind from land not that person's own, without permission, and provides for damages of up

18

to three times actual damages. *See id.* § 7552(2)-(4). Plaintiff's section 7552 claim is that, without permission, Hawkeye and/or Emera removed or damaged trees and forest products on the Property and are therefore subject to statutory damages. To the extent Plaintiff brings the section 7552 claim for damage to the roads as well as damage to trees, the court does not view section 7552 as covering Plaintiff's roads. Plaintiff gave permission to BHE and its contractors to use the roads, orally and in writing, and it was understood that there would be some damage done, which is why the License Agreement calls for the roads to be repaired for any damage beyond normal wear and tear. On the other hand, Plaintiff did not give the Defendants permission to damage his trees.

64. Count IV of the Amended Complaint asserts a claim under 14 M.R.S. § 7551-B, which imposes liability for intentionally entering another person's property without permission and "damag[ing] any road, drainage ditch, culvert, bridge, sign or paint marking . . ." *Id.* § 7551-B(1)(A). Intentionally caused damage subjects the responsible person to double damages. *Id.* § 7551-B(2). This count is relevant to the Plaintiff's claims for damage to the Taylor Road and the Taylor 1 spur road.

65. The fact that, by virtue of the License Agreement, Plaintiff granted BHE and Hawkeye license to enter and travel over the Property precludes him from asserting the statutory trespass and damage claims in Count IV against Emera and Hawkeye. Because section 7551-B explicitly imposes liability only upon "[a] person who intentionally enters the land of another without permission . . ." and because BHE and Hawkeye had Plaintiff's permission to enter on and use the Taylor Road as well as the spur road, he cannot hold them liable under section 7551-B. (Note that this conclusion does not apply to Plaintiff's section 7552 claim in Count III because that section imposes liability for damaging trees without

19

permission, without any reference to the manner of entry onto the property, and Plaintiff did not give the Defendants permission to damage trees).

66. Lastly, Count VI of the Amended Complaint asserts what appears to be a common law trespass claim against both Defendants, claiming that they entered and used the Taylor 1 spur road without Plaintiff's permission, and also that they converted the spur road, which the Amended Complaint says had been only a "twitch trail" or skidder trail not suitable for vehicle travel, into a graveled road, without Plaintiff's consent.

*Evidence Regarding Liability and Damages*

67. This section of this Decision analyzes the evidence as to each of the areas of breach and damage that the Plaintiff alleges. He asserts that the Defendants are liable for damages as follows:

- for damage regarding the 1400-foot long approach road owned by the Town of Greenbush

- for damage to the gate at the entrance to Plaintiff's property

- for damage to Taylor Road and the roadside areas

- for damage associated with material "spewed" into the woodland on either side of Taylor Road

- for damage to trees and other vegetation along Taylor Road and the spur road

- for trespass and damage to the Taylor 1 spur road

68. Plaintiff contends that the 1400' approach road to Plaintiff's property was rendered unusable because the large cobblestones used to repair the road prevent his company's heavy trucks and other logging equipment from safely traveling the approach road. The License Agreement does not apply to the 1400' approach road because it is not part of Plaintiff's Property.

69. However, the evidence indicated that BHE and Hawkeye acknowledged responsibility for the approach road; even had they not done so, as noted above in the

20

discussion of Plaintiff's negligence claim, they owed Plaintiff a duty not to interfere with his access to his property. The applicable legal principle is that users of an easement (Emera and Hawkeye in this case) can be liable in negligence to another user (Plaintiff in this case) for causing physical damage to the easement property that impairs or precludes the other user's access.

70. The Defendants also point out that the Plaintiff himself placed the cobblestone that he complains of, but the evidence established that Plaintiff did so for purposes of creating a base layer only, over which a surface layer of gravel was to be installed. In fact, Gil Paquette, the TRC consultant monitoring the project on behalf of Emera, confirmed the need for gravel in an email message to Hawkeye's project manager, Patrick Quigley, dated November 30. Titled "Taylor Road Punch List," Mr. Paquette's message lists as the first item "Cobble near beginning of Taylor Road should be graveled." The court finds that this was a directive to Hawkeye to place gravel over the cobblestone on the approach road, and that Hawkeye failed to follow through—an omission for which both Defendants are legally responsible to Plaintiff.

71. Defendants point out that the approach road was repaired to the satisfaction of the Town of Greenbush, owner of the land over which the approach road runs, upon the completion of activities on the Approach Road. (Trial Tran. Vol. 4, p. 220:12-14). However, the Town's approval is only evidence and not a bar to Plaintiff's claim. There is no indication that the Town cares whether the approach road is passable for Plaintiff's heavy vehicles. Defendant Hawkeye points out that the reason it did not put gravel on the approach road was that Mr. Paquette at some point changed his mind about the need for it, because the Town of Greenbush had accepted the road. However, in the court's view, Mr. Paquette was correct in including the approach road on the punch list, and his change of mind does not exonerate either Emera or Hawkeye.

21

72. The evidence showed the cost of completing the approach road was $22,000, so Plaintiff is entitled to recover damages against both Defendants in that amount. The award is made against both Defendants jointly and severally based on the Count II negligence claim.

73. For purposes of Emera's cross-claim against Hawkeye, the court finds and concludes that Hawkeye was solely responsible for negligently causing damage to the approach road and for failing to install the gravel surface layer that would have made the approach road passable for Plaintiff's vehicles. Emera's joint and several liability is based solely on the fact that it was Hawkeye's principal for purposes of Plaintiff's negligence claim.

74. Plaintiff alleges that Defendants caused damage to the gate leading into the Taylor Road system and that Defendants failed to repair the damage in violation of the License Agreement. Gordon Boyington, who originally made the gate for the prior owner, was hired by Hawkeye to repair the gate. Mr. Boyington testified that after his repairs, the gate was in as good condition as it had been before Defendants entered the property. Plaintiff failed to prove that either Defendant is liable to him for damages with respect to the gate.

75. With regard to damage to the Taylor Road, Plaintiff contends that many culverts on Taylor Road and Madden Meadows Road North were damaged by Defendants, that Defendants failed to remediate the damage in accordance with the License Agreement, and that Defendants are in breach of the License Agreement for failing to remediate. Plaintiff looks to Gil Paquette's "punch list" for support to this claim. Plaintiff also points out that Sunset Development, hired by Hawkeye to remediate, were hired only for selected areas, not for the entire property. *See Testimony of Joseph Reinzo* (Trial Day 8) at 120-26. Defendants argue that the work of Sunset Development put the roads in better condition than they had been before the License Agreement.

22

76. Based on all the testimony, the photographic evidence of the condition of the road and adjacent ditched areas before and after Hawkeye's work, as well as the view of the property, the court finds that Sunset Development's work has repaired the road damage resulting from Hawkeye's work, repaired the culverts, and restored much of the ditching that was filled in with road material moved there by the passage of vehicles and mats, and by Hawkeye's periodic scraping off of muddy material. However, Sunset only completed work on select portions of the Taylor Road, and there remain sections of filled-in ditching that have yet to be restored. These sections of filled-in ditching on either side of the Taylor Road, if added together, total about one mile.

77. Based on Sunset having been paid about $55,000 for all the work that it did, the court finds that the sum of $20,000 reflects a reasonable approximation of the cost to restore the ditching still in need of restoration. Plaintiff's evidence did not show unrestored or unrepaired damage beyond that, so the award for this item of damage is limited to $20,000. Plaintiff did not prove that the Defendants damaged Taylor Road intentionally for purposes of the double damages provision at section 7551-B. The double damage provision covers situations involving damage to property committed in order to cause damage, such as vandalism. The damage in question—filled-in ditches—was not intentional, because it resulted mainly from Hawkeye's efforts to move vehicles and mats along Taylor Road, and to scrape mud off the surface of Taylor Road. As noted above, Hawkeye made some effort to remediate the damage, both at the time through backdragging, and afterward by retaining Sunset Development.

78. Therefore, Plaintiff is entitled to an award of actual damages of $20,000, measured by the cost to repair the Taylor Road, specifically by removing material from filled-in ditching. The award is made against Emera and Hawkeye jointly and severally. The award is made on

23

Count I against Emera only, but jointly and severally against both Defendants on Count IV, the Plaintiff's section 7551-B claim.[2]

79. For purposes of Emera's cross-claim against Hawkeye, the court finds and concludes that Hawkeye is solely responsible for the acts and omissions resulting in this damages award—namely the insufficient repair of filled-in ditching—and that Emera's joint and several liability is based solely on the fact that it was Hawkeye's principal and was the obligor to Plaintiff on the License Agreement provision requiring repair.

80. With regard to Plaintiff's claim about material from Taylor Road being "spewed" into the surrounding woodland, the court finds that, although Norm Turner's testimony does indicate that a quantity of material ended up in the woods, the evidence does not substantiate Plaintiff's claim that the material needs to be removed. Plaintiff's soil science expert, Steven Howell, testified that some material from the road has been detected at test borings, but the evidence does not establish the quantity of road material present on the forest floor, either by area or by depth. *Testimony of Steven Howell* (Trial Day 6) at 140, 145-46. Based on the testimony of Rodney Kelshaw, a soil scientist hired by Hawkeye, it is doubtful that material from the road was deposited anywhere near as extensively or as widely as Plaintiff contends. *Testimony of Rodney Kelshaw* (Trial Day 5) at 260-61.

81. As to Plaintiff's claim in Counts III and IV of the Amended Complaint that the road material deposited in the woods has caused, is causing, or will cause, damage to trees, the evidence did not support the claim. Based on the testimony of Emera's forestry expert, David Irving, and the court's own observations during the view, the court finds that the trees on the Property are generally healthy and productive, with no visible signs of damage due to the

---

[2] Plaintiff's prayer for relief in Count IV does not specifically request damages relating to damage to the roads; it requests damages for "whatever sums are reasonable in the premises," including damages for the loss of forest products and trees and diminution in value of real estate. However, the specific reference to forest products and trees is not a limitation on damages.

24

presence of material from the road. *See, e.g., Testimony of David Irving* (Trial Day 5) at 192 ("I thought the condition of the trees was very good all along the length of the road").

82. Plaintiff argues that, because a reference to removing material from the woods by means of a vacuum truck appears in a communication from Gil Paquette to Patrick Quigley, BHE and Hawkeye have acknowledged the need to vacuum miles of woods on either side of the Taylor Road. Mr. Quigley did evidently tell Mr. McLaughlin Hawkeye was willing to consider doing some vacuuming in the woods, but his statement was not specific as to how much or in what areas vacuuming would be performed, so it is not sufficiently integrated to be binding in any contractual sense on either Emera or Hawkeye.

83. In sum, Plaintiff failed to prove either that whatever quantity of material was deposited in the woods along Taylor Road has caused, is causing or will cause, any damage to the trees, and therefore failed to prove that he is entitled to any damages for the cost of removal or any other measure of damages.

84. Plaintiff also claims that, even apart from material being deposited into the woods, the Line 64 Rebuild Project caused significant damage to trees along the roadway and that Defendants failed to repair the damage or reimburse Plaintiff for the trees. In support of his claim, Plaintiff points to the count that he and Patrick Quigley prepared after Hawkeye had left the Property. They counted 4,448 damaged or destroyed trees or other vegetation along the road, but they did not produce any inventory indicating the size or species of any of what they counted.

85. Mr. Kolenik, Hawkeye's retained forester, also did a count of damaged trees along the road on the Property and found that only 54 trees measuring two inches or more were damaged. Using statutory forfeiture amounts and market value, he calculated that the damaged stems had a total value of $1,433.18. *See Testimony of John Kolenik* (Trial Day 3) at

25

243, 252-53. Hawkeye issued Plaintiff a check for that amount that Plaintiff refused to accept. Defendants contend that any damage caused to the trees was fully compensated by the check tendered to Plaintiff.

86. The only rational explanation for the vast difference between the number of damaged trees counted is that Mr. McLaughlin and Mr. Quigley counted everything, no matter how small, whereas Mr. Kolenik counted only trees above two inches in diameter—those that had market value or were compensable under the timber trespass statute, *see* 14 M.R.S. § 7552; 17 M.R.S. § 2510.

87. Section 7552 provides for damages as follows:

3. Measure of damages. This subsection governs the measurement of damages resulting from a violation of subsection 2.
A. When agricultural or forest products have been destroyed or carried away, the owner may recover as damages either the value of the lost products themselves or the diminution in value of the real estate as a whole resulting from the violation, whichever is greater.
B. Except within areas that have been zoned for residential use, for lost trees the owner may choose to claim:
(1) The market value of the lost trees;
(2) The diminution in value of the real estate as a whole resulting from the violation;
(3) The forfeiture amounts determined in Title 17, section 2510, subsections 2 and 3; or
(4) If the lost trees are ornamental or fruit trees, the costs of replacing, replanting and restoring the trees with trees of comparable size and the same or equivalent species and the actual costs for cleanup of damage caused during the cutting.
In addition, the owner's damages for lost trees that are not ornamental or fruit trees may include the costs for regeneration of the stand in accordance with Title 12, section 8869.
The court may reduce the damages awarded for good cause shown when the cutting of trees was done negligently or without fault.

Public utilities, as defined in Title 35-A, section 102, and contractors performing work for public utilities are not liable for damages under this paragraph for lost trees the trimming or removal of which is necessary to provide safe and reliable service to the customers of the public utilities.

26

14 M.R.S. § 7552(3).[3]

88. The timber trespass statute referenced in section 7553(3) makes it a civil violation to harvest a tree without the owner's consent, and establishes "forfeiture amounts" for unlawfully harvested trees of more than two inches in diameter at a height of four and a half feet above ground. *See* 17 M.R.S. § 2510(1)-(3). The owner of unlawfully harvested trees is entitled to restitution for "financial loss" over and above the forfeiture amounts. *See id.* § 2510(4).

89. Plaintiff seeks damages for the value of the 4,448 trees and plants counted by him and Mr. Quigley and also damages for "regeneration of the stand," as permitted by section 7552(3)(B)(1) and (4). Plaintiff's claim appears to assume that all 4,448 trees and plants counted by Mr. McLaughlin and Mr. Quigley were of sufficient size to have some value, but the evidence simply does not establish that point. The court does not view the two-inch diameter provision of section 2510 as meaning that smaller trees have no market value, but Plaintiff's evidence was insufficient to prove that he is entitled to damages due to the loss of any particular number of trees or plants, either in terms of forfeiture value or in terms of market value or any other measure of value. Accordingly, the court adopts Mr. Kolenik's analysis in full and concludes that Plaintiff has not proved he is entitled to compensation for damage to trees beyond the $1,433.18 amount Hawkeye has previously tendered. There is no evidence indicating whether the trees for which Plaintiff is entitled to compensation were damaged negligently or intentionally, or with malice or without fault. Presumably the Plaintiff bears the burden of proving intentional damage or malice, so the court concludes that he is not entitled

---

[3] Section 7552 exempts public utilities and their contractors from liability for cutting or removing trees if "the trimming or removal . . . is necessary to provide safe and reliable service to the customers of the public utilities." The exemption does not apply here because there is no evidence that any damage to the Plaintiff's trees was necessary to provide safe and reliable service to BHE's customers.

27

to treble damages or punitive damages, but only the double damages allowed by section 7552 for damage committed negligently or without fault. *See* 14 M.R.S. § 7552(4)(A).

90. The last area in which Plaintiff claims damages has to do with the alleged trespass on the Taylor 1 spur road and the alleged unpermitted widening and improvement of the Taylor 1 spur road. Conceptually, these are two distinct claims—one is based on unpermitted entry and use and the other is based on unpermitted alterations.

91. "A person is liable for common law trespass 'irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally enters land in the possession of the other, or causes a thing or a third person to do so.'" *Medeika v. Watts*, 2008 ME 163, ¶ 5, 957 A.2d 980 (Me. 2008). As noted above, the court finds that the License Agreement did not confer any right on BHE or its contractors to use the Taylor 1 spur road to access the transmission line, but that Mr. McLaughlin gave oral permission to BHE and Hawkeye to do so. Plaintiff argues that oral permission was insufficient and that his written consent was required. However, as Emera points out, Plaintiff was not more than an unintended, incidental beneficiary of the agreement between Hawkeye and BHE that did require any modification to be in writing. Accordingly, Plaintiff has not proved that their use of the Taylor 1 spur road was a trespass.

92. As to the alterations, the court finds and concludes that Plaintiff has not proved that either Defendant is liable to him for damages. First, in granting oral permission for Defendants to bring heavy equipment and vehicles over what was then a skidder or twitch trail only, Plaintiff had to have known that they would need to improve it substantially, by widening it and installing gravel and other road material. Hawkeye did convert the trail into a serviceable road, thereby improving Plaintiff's access to various parts of the Property. The

28

improvement and resulting benefit to Plaintiff's property could serve as consideration for his oral agreement that Hawkeye and BHE could use the trail as a means of access to the line.

*Emera's Cross-Claim Against Hawkeye*

93. Emera has filed a cross-claim against Hawkeye, seeking indemnification against any damages awarded against Emera and Emera's attorney fees and costs incurred in defense of the case.

94. Emera's indemnification cross-claim is based on the indemnity provisions at section 16 of the Supplier of Choice Agreement (SOCA) between Emera's predecessor, BHE, as Purchaser and Hawkeye as Seller of the services and products encompassed in the SOCA. Section 16.2 of the SOCA reads as follows:

> 16.2 The Seller agrees to indemnify, release and save harmless the Purchaser, its directors, officers, servants, agents or employees, and their heirs, executors, administrators, successors and assigns, or any of them, from and against any liabilities, losses, expenses (including reasonable attorneys' fees), claims, demands, actions and causes of action, whatsoever arising out of, or in any way attributable to, the operation of this Agreement or ancillary to Seller's negligent provision of the Products and/or Services contemplated herein. The indemnification obligation set forth in this Clause shall not apply to the extent that injuries, death, loss, damage or destruction is caused by the sole negligence or willful misconduct of Purchaser or its employees. In the event any loss or damage results from the concurrent negligence of Purchaser and Seller, each Party shall be responsible for its proportionate share of fault as well as defense costs.

95. Hawkeye raises several objections to Emera's cross-claim.

96. First, Hawkeye asserts that Emera's cross-claim is barred because BHE made final payment to Hawkeye and released its claims. Hawkeye asserts that the letter of final payment issued by the TRC consultant, Gil Paquette, on behalf of BHE and dated March 1, 2012 operates to preclude Emera from asserting any claim under the SOCA for indemnification. Neither the final payment letter nor the SOCA supports Hawkeye's position. The court finds and concludes that Emera's cross-claim is not barred by release or accord and satisfaction or any other bar.

29

97. Second, Hawkeye points out that its duty to indemnify BHE under the SOCA is limited when the damage or loss is due to BHE's sole negligence or fault, or due to concurrent negligence or fault on the part of BHE and Hawkeye. The court has already found and concluded, for purposes of Emera's cross-claim against Hawkeye, that the damages awarded to Plaintiff in this case arise from acts or omissions for which Hawkeye is solely responsible, and that Emera's joint and several liability for those damages is based solely on the fact that it was Hawkeye's principal and the obligor on the License Agreement.

98. Third, Hawkeye responds to Emera's claim as to its costs of defense by asserting that Emera has waived any right to recover costs of defense because it elected to mount its own defense rather than tendering the defense to Hawkeye. Whether an indemnitee must tender the defense of a covered claim to the indemnitor in order to preserve the right to recover costs incurred in defense of the claim appears to be an open question under Maine law.

99. There is authority elsewhere to the effect that an indemnitee's failure to tender the defense constitutes a waiver of the right to indemnification against the costs of defense, although not a waiver of the right to indemnification on liability for damages. *See* 2-21 COMMERCIAL AND CONSUMER WARRANTIES § 21.09 ("vouching-in" defendant in a Uniform Commercial Code action must tender defense to vouchee; "if the defense is not tendered, it means that the potential voucher will not be able to recover attorney's fees and costs."); 1-5 CONSTRUCTION INSURANCE: COVERAGES AND DISPUTES § 5-2 (discussion of effect of insured's failure to tender defense on ability to recover costs of defense from insurer); Annot. 53 A.L.R.4th 414 (discussion of need to tender defense in product liability actions).

100. In an illustrative opinion, the district court in *Itzep v. Target Corporation,* noted, "Under Minnesota law, a defendant's failure to tender the defense precludes an award of attorney's fees for the defense. Further, filing a cross-claim against a co-defendant for

30

indemnity does not amount to tender of the defense." 2010 U.S. Dist. LEXIS 55185 *60 (W.D. Tex. 2010) (citations omitted).

101. On the other hand, as Emera points out, Maine law does not establish any general duty on the part of an indemnitee to tender the defense of a covered claim in order to obtain indemnification for the costs of defense. Moreover, nothing in the SOCA indemnity section makes the indemnitee's tender of the defense of a claim a requirement or prerequisite to indemnification. Also, Hawkeye has not shown that it has been prejudiced in any way by Emera's failure to tender the defense. As Emera points out, Hawkeye could have asked Emera to tender the defense, particularly in light of Emera's cross-claim, which plainly put Hawkeye on notice that Emera was seeking indemnification for costs of defense as well as for any damages.

102. When an indemnity contract is unambiguous and imposes no requirement that the indemnitee tender the defense, and where the absence of a formal tender has not prejudiced the indemnitor in any cognizable way, the indemnity contract should be interpreted and enforced according to its unambiguous terms without the imposition of additional terms that the parties did not bargain for. *See Devine v. Roche Biomedical Lab., Inc.*, 637 A.2d 441, 446 (Me. 1994) ("Like any other terms of a contract, indemnity provisions should be interpreted according to their plain, unambiguous language"). Accordingly, Emera's cross-claim as it relates to costs of defense is not precluded.

103. If any one or more of the claims of the Plaintiff were based solely on the alleged negligence or other fault of BHE or the concurrent negligence or other fault of BHE and Hawkeye, Emera's right to recover costs of defense would be limited accordingly. However, the court finds and concludes that all of the Plaintiff's claims in this case, including those for which this Decision does not award any damages, stem from the acts or omissions of Hawkeye,

31

as BHE's agent, rather than acts or omissions of BHE solely or acts of Hawkeye and BHE concurrently. For example, it was Hawkeye, not BHE, that dragged mats and scraped mud off Taylor Road into ditches and woods.

104. For these reasons, Emera will be granted judgment against Hawkeye on the cross-claim for indemnification of both costs of the defense and the joint and several damages awards.

*Conclusion*

For purposes of the Amended Complaint, the court finds and concludes as follows:

- Plaintiff proved that he is entitled to an award of damages of $22,000 for the cost of restoring the approach road and $20,000 for the cost of completing the work on ditches along the Taylor Road, totaling $42,000. Any further damage done to the road and culverts has been repaired and remediated as required by the License Agreement and applicable law

- Defendants caused $1,433.18 in damage to Plaintiff's trees and he is entitled to double damages by statute, because the trees were damaged negligently or without fault. *See* 14 M.R.S. § 7552(4)(A). Although Defendant Hawkeye tendered payment to Plaintiff, the tender did not include double damages, so he was justified in refusing it, and he is entitled to attorney fees and costs under 14 M.R.S. § 7552(5). However, in assessing attorney fees, the court will consider the fact that Defendants acknowledged Plaintiff's actual damages of $1,433.18 and tendered payment in that amount.

- Plaintiff did not prove that he is entitled to damages or further compensation for damage to the Taylor Road entry gate; remediation of siltation; other repair to Taylor Road; damage to any culverts; or additional loss of forest product and woodland. Plaintiff also did not prove that either Defendant is liable for any diminution of the value of his property.

The court's awards on each count of the Amended Complaint are as follows:

- On Count I (Breach of Contract, License Agreement) of the Amended Complaint, judgment is awarded to Plaintiff against Defendant Emera Maine in the amount of $20,000.

32

- On Count II (Negligence) of the Amended Complaint, judgment is awarded to Plaintiff against Defendant Emera for $22,000 and against Defendant Hawkeye for $42,000.[+]

- On Count III (Injury to Land – 14 M.R.S. § 7552) of the Amended Complaint, Plaintiff is awarded $2,866.36 (twice his actual damages of $1,433.18) against both Defendants jointly and severally. Pursuant to 14 M.R.S. § 7552(5), Plaintiff is also awarded the attorney fees and costs attributable to this claim, also jointly and severally.

- On Count IV (Trespass – 14 M.R.S. § 7551-B), judgment shall be entered for Defendants, because their entry onto Plaintiff's roads was with permission and section 7551-B applies only when the alleged entry onto a plaintiff's land was a trespass, i.e. without the plaintiff's permission.

- On Count VI (Defendants regarding building of the "Spur Road" – Trespass), judgment shall be entered for Defendants.

The net effect is that both Defendants are liable to Plaintiff for damages totaling $44,866.36. On Defendant Emera's cross-claim, the court awards judgment for Emera against Hawkeye for $44,866.36 and the attorney fees and costs awarded to Plaintiff on Count III. Lastly, given that Plaintiff proved some of his claims and the Defendants prevailed on the others, no party can be deemed to have substantially prevailed in the case as a whole, except that Emera did prevail on its cross-claim.

Accordingly, it is hereby ORDERED AND ADJUDGED AS FOLLOWS:

1. Plaintiff Jay McLaughlin is awarded judgment against Defendants Emera Maine and Hawkeye, LLC jointly and severally in the total amount of $44,866.36.

2. Plaintiff is awarded his reasonable attorney fees and costs attributable to the claim under 14 M.R.S. § 7552 in Count III of the Amended Complaint.

3. Plaintiff is awarded pre-judgment and post-judgment interest on the judgment.

---

[+] Due to the existence of the contractual obligations defined in the License Agreement, Emera is not liable for negligence with respect to the $20,000 in damages relating to filled-in ditching on Taylor Road.

4. Defendant Emera Maine is awarded judgment on its cross-claim against Defendant Hawkeye, LLC for the damages, attorney fees, costs and interest awarded to Plaintiff, and for Emera Maine's reasonable attorney fees and costs incurred in the defense of Plaintiff's claims and in the prosecution of Emera's cross-claim.

5. Except for costs awarded on Count III, Plaintiff is not awarded costs against Defendants.

6. Hawkeye is not awarded its costs against Plaintiff or Emera Maine.

7. Emera Maine is not awarded costs against Plaintiff and is awarded costs on the cross-claim against Hawkeye.

8. The court will decide Plaintiff's and Emera's applications for attorney fees and costs in separate orders after briefing on those issues is complete.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Decision by reference in the docket.

Dated November 1, 2016

_____
A. M. Horton
Justice, Business and Consumer Court

Jay McLaughlin v. Emera Maine, f/k/a Bangor Hydro-Electric Company, and Hawkeye, LLC

**BCD-CV-2015-14**

Jay McLaughlin

    **Plaintiff**

        Counsel:                  *Joseph Ferris, Esq.*
                                 23 Water St. Suite 400
                                 Bangor, ME 04402

Emera Maine

    **Defendant**

        Counsel:                  *William Devoe, Esq.*
                                 80 Exchange St.
                                 Bangor, ME 04402-1210

Hawkey, LLC

        Counsel:                  *Jeffrey Edwards, Esq.*
                                   One City Center
                                 Portland, ME 04112-9546

STATE OF MAINE                          BUSINESS AND CONSUMER COURT

Cumberland, ss.


JAY McLAUGHLIN,

                    Plaintiff

        v.                                      Docket No. BCD-CV-15-14 ✓

EMERA MAINE, f/k/a Bangor Hydro-Electric Company,
and HAWKEYE, LLC

                    Defendants

## ORDER ON PLAINTIFF'S REQUEST
## FOR FINDINGS OF FACTS AND CONCLUSIONS OF LAW

Pursuant to Rule 52 of the Maine Rules of Civil Procedure, Plaintiff Jay McLaughlin has filed Plaintiff's Request for Findings of Facts and Conclusions of Law, along with a proposed Order. Defendants Emera Maine and Hawkeye, LLC have both filed objections.

One of the objections is based on the 36-page length of the Plaintiff's Request. To the extent the Rule 7(f) page limits apply to Rule 52 motions, Plaintiff has filed a motion to enlarge the page limits in response to Defendants' objections, and that motion will be granted.

A more substantive objection is that the Plaintiff's Request for Findings of Fact and Conclusions of Law does not set forth, at least in any express fashion, the findings of fact and conclusions of law that the Plaintiff is requesting the court to adopt. Because the court has already made detailed findings in its Decision, Plaintiff's Request is a motion for amended or additional findings under Rule 52(b) rather than a motion for initial findings under Rule 52(a). Both kinds of motion are required to "include the proposed findings of fact and conclusions of law requested." M.R. Civ. P. 52(a), 52(b). A Rule 52(b) motion that does not include the requested findings and conclusions is not proper and may be denied on that basis alone. *See*

1

*Eremita v. Marchiori*, 2016 ME 160, ¶3, ___ A.3d ___, ___, 2016 Me. LEXIS 179; *Dalton v. Dalton*, 2014 ME108, ¶22, 93 A.3d 723, 728.

Plaintiff's Request for Findings of Facts and Conclusions of Law consists of 55 numbered paragraphs, each asking a question such as, "Upon what facts did the Court find . . ." or "Did the court consider . . ." Some of the numbered paragraphs do refer to evidence and the law, but none of them asks the court to adopt these references as findings and conclusions.

Plaintiff's proposed order also is 36 pages long and appears to be a somewhat reworked version of the Request, in that it enumerates the points of evidence and law that the court supposedly failed to consider, and concludes:

> 56. As a result, the Court will consider all of these facts and the Law, and recalculate Plaintiff's damages to include each element that was erroneously missed in the decision, using Plaintiff's damages numbers requests.

Plaintiff's proposed Order at 72.

The court is not required to answer the Plaintiff's series of questions as to the basis and reasoning underlying its rulings. In *Wandishin v. Wandishin*, the Law Court addressed a similar situation, in which a party filed a Rule 52 motion requesting the court to explain its basis for certain decisions. 2009 ME 73, ¶¶7-9, 976 A.2d 949, 952-53. Pointing out that the motion was "couched in language better suited to interrogatories that might be directed to a hostile party, rather than a request for findings of fact directed to a court," the Law Court noted, "It was within the court's discretion to summarily deny such inappropriate demands to explain the rationale for its opinion." *Id.*

The court plainly did not evaluate the evidence or view the law as Plaintiff does. As the court's Decision indicated, the court accepted much of the Plaintiff's evidence about damage to the road, about earth material being deposited into ditches and wooded areas

2

next to the road, and about some damage to trees along the road. However, in three significant respects, the court did not accept the Plaintiff's evidence.

First, the court deemed Hawkeye's remediation efforts, including the work of Sunset Development, to have repaired most of the road damage beyond "normal wear and tear," and to have adequately addressed the effect of sediment on culverts, wetlands and woodlands.

Second, the court deemed Mr. Kolenik's analysis of tree damage to have covered any entitlement to damages Plaintiff may have, and did not accept the additional evidence regarding the 4,448 "stems" as translating to actual money damages.

Third, the court did not accept Plaintiff's evidence that whatever sediment remains in wooded areas needs to be removed, nor that it is causing or has caused loss of trees or harm to trees.

For these reasons, the court does not adopt the unspecified findings and conclusions that the Plaintiff's Motion appears intended to elicit, with one exception. The court erred in finding that Plaintiff accepted the tendered payment of $1,433.18 for tree damage as Mr. Kolenik calculated it, so the Amended Decision being issued herewith finds that he did not. Accordingly, the damages award to Plaintiff has been modified to include the double damages available by statute for trees damaged negligently or without fault, which was the case here. [1]

IT IS HEREBY ORDERED AS FOLLOWS:

---

[1] The court has also modified the Decision in response to Hawkeye's Rule 59(e) motion to reconsider, by ruling for the Defendants on Plaintiff's claim under the trespass statute, 14 M.R.S. § 7551-B. Because Defendants entered onto Plaintiff's property pursuant to written permission (and oral permission with respect to the Spur Road), and because section 7551-B applies only when the entry onto a plaintiff's property is a trespass, i.e. without permission, Defendants are not liable under section 7551-B. The outcome on Plaintiff's section 7552 claim differs because section 7552 does not require that a defendant have entered a plaintiff's property without permission.

3

1.  Plaintiff's Request for Findings of Facts and Conclusions of Law is granted in part, to the extent set forth in this Order and in the Amended Decision issued herewith, and is otherwise denied.

2.  Plaintiff's Motion for Enlargement of Page Limit for his Rule 52 Request is hereby granted.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated November 1, 2016

_____
A. M. Horton, Justice

4

Jay McLaughlin v. Emera Maine, f/k/a Bangor Hydro-Electric Company, and Hawkeye, LLC

## BCD-CV-2015-14

Jay McLaughlin

    **Plaintiff**

        Counsel:                *Joseph Ferris, Esq.*
                                 23 Water St. Suite 400
                                 Bangor, ME 04402

Emera Maine

    **Defendant**

        Counsel:                 *William Devoe, Esq.*
                                 80 Exchange St.
                                 Bangor, ME 04402-1210

Hawkey, LLC

        Counsel:                 *Jeffrey Edwards, Esq.*
                                   One City Center
                                 Portland, ME 04112-9546